

FILED
CLERK, U.S. DISTRICT COURT

JUL - 1 2021

CENTRAL DISTRICT OF CALIFORNIA
BY          DTA          DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

UNITED STATES OF AMERICA, *ex rel.* IAN ISAACSON, an individual,

Plaintiff,

v.

AMERICAN FINANCIAL NETWORK, INC., a California corporation; JOHN SHERMAN, an individual; JACK SHERMAN, an individual, JONATHAN GWIN; an individual; and TWYLAY HANKINS, an individual

Defendants.

CASE NO.: 8:21cv1144-CJC-DFMx

**COMPLAINT FOR MONEY DAMAGES FOR VIOLATIONS OF THE FALSE CLAIMS ACT AND FINANCIAL INSTITUTIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989**

**FILED UNDER SEAL PURSUANT TO ORDER OF THE COURT DATED JUNE 10, 2021**

THE LAW OFFICE OF JEFFREY G. JACOBS
98 DISCOVERY
IRVINE, CALIFORNIA 92618-3105
TEL. (949) 280-9612
FACSIMILE: (949) 450-9368
EMAIL: jeff@jgjesq.com
(JEFFREY G. JACOBS, STATE BAR NUMBER #205913)
Attorney for Plaintiff, IAN ISAACSON

LAW OFFICE OF JAMES D. WHITE
113 QUARTERHORSE ROAD
P.O. BOX 367
BELLEVUE, ID 83315
TEL. (949) 697-9236
EMAIL: jdw@jamesdwhitelaw.com
(JAMES D. WHITE, STATE BAR NUMBER #64721)
Attorney for Plaintiff, IAN ISAACSON

FILED
CLERK, U.S. DISTRICT COURT

JUL - 1 2021

CENTRAL DISTRICT OF CALIFORNIA
BY    DTA    DEPUTY

Fee
Paid

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* IAN ISAACSON, an individual,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN FINANCIAL NETWORK, INC., a California corporation; JOHN SHERMAN, an individual; JACK SHERMAN, an individual, JONATHAN GWIN; an individual; and TWYLAY HANKINS, an individual<br><br>Defendants. | CASE NO.: 8:21cv1144-CJC-DFMx<br><br>**COMPLAINT FOR MONEY DAMAGES FOR VIOLATIONS OF THE FALSE CLAIMS ACT AND FINANCIAL INSTITUTIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989**<br><br>**[DEMAND FOR TRIAL BY JURY]** |

## TABLE OF CONTENTS

JURISDICTION AND VENUE...................................................................5

SUMMARY INTRODUCTION................................................................7

THE PARTIES....................................................................................12

RELEVANT STATUTES TO COMBAT MORTGAGE FRAUD......................15

FACTUAL ALLEGATIONS RELATED TO ALL CAUSES OF ACTIONS..........16

DEFENDANTS RETALIATED AGAINST MR. ISSACSON BY
WRONGFULLY TERMINATED HIM AFTER HE
REPORTED AFN'S UNLAWFUL BUSINESS   PRACTICES.........................22

FHA MORTGAGE INSURANCE PROGRAM. .........................................25

      A.  Overview of the FHA Mortgage Insurance Program, the
          DE Program, and the LI Program.........................................25

      B.  Lenders Must Submit Truthful Certifications........................28

      C.  Lenders Must Use Qualified Underwriters...........................29
      D.  Lenders Must Perform Proper Due Diligence and
          Ensure Accuracy.............................................................30

      E.  FHA Requires Lenders to Certify Their Compliance with
          Their Programmatic Responsibilities....................................37

      F.  HUD regulations prohibit the unlawful "net branching" and
          require HUD-approved lenders to pay all operating expenses
          for its branches and forbade lenders from shifting liability of
          those expenses to the branch or its employers..........................42

      G.  HUD regulations prohibit the unlawful "virtual   branching"......43

    I.     AFN'S PARTICPATION IN THE FHA PROGRAM....................47

        A.    AFN Directly Endorsed FHA Loans, Many of Which
            Have Defaulted, Requiring FHA to Pay Substantial
            Insurance Claims...........................................................47

        B.    AFN Certified That it Complied With HUD
            Requirements to Gain and Maintain Eligibility
            in the DE Program.........................................................48

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 3

EXAMPLES OF DEFENDANTS UNLAWFUL BUSINESS PRACTICES............50

II.    AFN UNLAWFUL BUSINESS PRACTICES
       INTENTIONALLY DEFRAUTED HUD, FHA INSURANCE,
       INSTITUTIONAL INVESTORS AND CUSTOMERS...................50

       A.    AFN's Intentional Unlawful Conduct Violated HUD Rules
             and Requirements Governing the Origination and
             Underwriting of FHA Insured Mortgages
             by Falsifying Documents and Providing
             False Annual Certifications to HUD.................................50

       B.    AFN's Wrongful Conduct Violated Specific HUD Rules
             and Requirements Governing the Origination and
             Underwriting of FHA Insured Mortgages by
             altering the Encompass Date Tracking...............................53

III.   AFN'S REFERRAL DESK PROGRAM INTENTIONALLY
       VIOLATED STATE AND FEDERAL LAWS BY DEFRAUDING
       THE FEDERAL GOVERNMENT................................................57

       A.    AFN Unlawfully Allowed Unlicensed Employees,
             Including Full-Time Direct Endorsement Underwriters,
             to Originate Residential Home Loans and Be
             Directly Compensated...........................................57

       B.    AFN's Referral Desk Training Program
             unlawfully originated residential home loans
             by allowing unlicensed AFN employees to
             communicate terms and conditions and negotiate
             residential home loans throughout the United States
             without a valid Branch License and a valid
             Mortgage Loan Originator (MLO) License.......................60

       C.    AFN Referral Desk Program compensated
             unlicensed AFN employees and incentives
             its unlicensed employees to originate residential
             home loans.............................................................62

IV.    AFN MISREPRESENTED ITS LOAN ORIGINATION
       SERVICES TO UNITED STATES VETERANS BY
       KNOWINGLY DECEIVING AND PROMOTING
       LOAN CHARACTERISTICS THAT COULD
       NOT BE SATISFIED AND WERE UNLAWFUL.......................65

V.      AFN FAILED TO REPORT OR DISCLOSE A LARGE
        DATA CREDIT DATA THEFT OF ITS CURRENT AND
        PAST CONSUMERS, INCLUDING THEIR CREDIT
        REPORT DATA AND PERSONAL INFORMATION..................69

VI.     AFN UNLAWFULLY SHARED CONFIDENTIAL
        CONSUMER DATA TO ITS BRANCH OFFICE
        FOR PROFIT, CAUSING HARM TO ITS CUSTOMERS
        AND IN VIOLATION OF STATE AND FEDERAL LAW..............75

VII.    THIRTY PERCENT (30%) OF AFN'S UNLAWFUL
        BUSINESS REVENUE DERIVES FROM FOUR INTERNAL
        DIVISIONS THAT WERE FORMED BY JOHN SHERMAN.........77

VIII.   AFN UNLAWFULLY TERMINATED ITS FORMER
        DIRECT ENDORSEMENT UNDERWRITER, *TO WIT,*
        IKAKYI GONZALEZ, FOR HIS REFUSAL TO SIGN
        KNOWINGLY FRAUDULENT DOCUMENTS ON BEHALF
        OF AFN TO BE SUBMITTED TO HUD AND THE
        UNITED STATES DEPARTMENT OF VETERANS
        AFFAIRS UNDER PENALTY OF PERJURY,
        AND THEN THEREAFTER PLANNED A COVER
        UP OF HIS WRONGFUL TERMINATION...............................78

IX.     AFN UNLAWFULLY CHARGED AFN BRANCH
        MANAGERS, INCLUDING MR. ISAACSON, FOR
        AFN'S EARLY PAYMENT DEFAULTS (EPD)
        AND EARLY PAYOFF PENALTIES (EPO) CAUSED
        BY AFN'S INCONSISTENT AND IMPROPER
        UNDERWRITING PROCESS..............................................79

IV.     AFN INTENTIONALLY ALTERED IT INTERNAL
        LOAN ORIGINATION SYSTEMS (ENCOMPASS) TO
        AVOID DISCLOSING THEIR TERMS AND CONDITIONS
        WITHIN THE THREE (3) DAY TIME PERIOD FOR
        DISCLOSING AND TO REDUCE SHIPPING COSTS
        REQUIRED BY LAW WHEN A
        CONSUMER DOES NOT E-CONSENT..................................80

CAUSES OF ACTIONS..............................................................83

PRAYER FOR RELIEF..............................................................96

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 5

**COMES NOW** plaintiff IAN ISAACSON (hereafter, "Mr. Isaacson" or "Plaintiff"), who brings this *qui tam* action in the name of the United States of America, by and through his undersigned attorney, Jeffrey G. Jacobs, Esq., of The Law Office of Jeffrey G. Jacobs and James D. White of The Law Office of James D. White, against defendants AMERICAN FINANCIAL NETWORK, INC., JOHN SHERMAN, JACK SHERMAN, JONATHAN GWIN  and TWYLA HANKINS, and each of them (collectively, the "Defendants"), and hereby alleges as follows.

## JURISDICTION AND VENUE

1.     This action arises under the False Claims Act, 31 U.S. C. § 3729 *et seq.,* U.S.C. §§ 1331 and 1345 and the Court's general equitable jurisdiction.

2.     This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

3.     Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because AFN transacts business in this district and did so at all times relevant to this complaint; and, as averred below, and AFN committed acts proscribed by 28 U.S.C. § 3729 - acts giving rise to this action – within this jurisdiction.

4.     Upon the filing of hereof, Mr. Isaacson will serve a copy of this Complaint upon the Attorney General of the United States and the United States

Attorney for the Central District of California – Santa Ana Division, together with a written disclosure statement setting forth and enclosing all material evidence and information Mr. Isaacson possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

5.      Mr. Isaacson has complied with all other conditions precedent to bringing this action.

6.      During and following this tenure with AFN, Mr. Isaacson acquired firsthand knowledge of the false claims by AFN described below.  Each described act(s) and/or omission(s) was knowingly committed by AFN in an attempt to secure federal funds through HUD or in an attempt to retain federal funds already paid it and to avoid disgorgement of those funds.  Mr. Isaacson is the original source of, and has direct and independent knowledge of, all publicly disclosed information on which any allegation herein might be deemed based, and he has voluntarily provided such information to the Government immediately upon filing this action.  The undersigned counsel shall provide a copy of this complaint and disclosure letter to the United States Attorney General and the United States Attorney for the Central District of California.

///

///

///

## SUMMARY INTRODUCTION

7.     This is a civil fraud action by *qui tam* plaintiff IAN ISAACSON, on behalf of the United States of America, against AFN and its named executives to recover treble damages and civil penalties under the False Claims Act, as amended, 31 U.S.C. § 3729 *et seq.*, and civil penalties under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1822a, arising from fraud on the United States Department of Housing and Urban Development ("HUD") in connection with AFN's origination of residential mortgage loans underwritten and approved by AFN and endorsed for Federal Housing Administration ("FHA") insurance between in or about January 2017 to March 20, 2020 (the "Lending Time Period").

8.     This is the story of brazenly unlawful corporate greed, which no federal or state governmental agency, private financial institution and/or the general public would have ever discovered, *but for* the high position that Mr. Isaacson held while employed at AFN, which allowed him to witness the inter-workings of the company's underlying illegal business practices.  Although Mr. Isaacson internally complained about (*and questioned*) these unlawful practices on numerous occasions to AFN executives, as detailed below, he was ultimately wrongfully terminated in retaliation for his repeated complaints.

9.     AFN is a non-depository mortgage company that, from 2001 to

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 8

present, originated mortgages nationwide.  It is among the largest non-bank

mortgage origination companies in the United States.

10.    On or about January 1, 2017, Mr. Isaacson was offered and accepted

the position to operate and manage an AFN's branch office (#4140) located in

Lake Forest, California, as AFN's Branch Manager.  As with any licensed Branch

Manager, Mr. Isaacson expected AFN to comply with HUD/FHA guidelines.  As

detailed above, HUD guidelines required AFN to ultimately be responsible for all

of operating expenses, including compensation, leases and equipment costs for all

the branch offices.

11.    Shortly after beginning his employment, Mr. Isaacson became aware

that AFN was committing numerous improper, illegal and unethical business

practices against various agencies, departments and branches of the United States

government and the State of California, including against its private institutional

investors and customers nationwide (*including, hundreds of United States*

*Veterans*).

12.    At that time, AFN represented itself as one of the fastest growing

mortgage bankers in the United States resulting from creating its own

"community based" branches across the nation.  In this regard, AFN claims to

have "…*built its reputation as an outstanding mortgage banking firm by*

*serving the lending needs of real estate professionals, builders, and individual*

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 9

*homebuyers throughout the United States.*"  Its showcased "*core values,*" as alleged on the company website, include a streamlined and efficient residential home loan business operation that optimizes organizational output and an approach to customer service founded on exceeding expectations.

13.  AFN's "*core value*" promises, however, were nothing more than strategically planned cover-ups of years of egregious unlawful business practices directed by a select few AFN executives (some *family related*), who controlled AFN's day-to-day business operations during at least from the start of Mr. Isaacson's employment and continuing to present.  These AFN executives include, but are not limited to the following individuals:

- **Jack Sherman** (AFN's Founder and Chief Executive Officer);

- **John Sherman** (AFN's President);

- **Jonathan Gwin** (AFN's Chief Operating Officer);

- **Twyla Hankins** (AFN's Executive Vice President of Operations);

- **Susie Sensenbach** (AFN's Director of Human Resources);

- **Michael VaVerka** (AFN's Referral Desk President, Referral Desk Loan Officer, Division President and Division Manager); and/or

- **Jonathan Carrico** (AFN's Referral Desk Loan Officer/Manager).

14.  Over the course of Mr. Isaacson's employment tenure at AFN, it became blatantly apparent that some and/or all of the above-referenced AFN

executives were unlawfully conducting and/or directing AFN's business operations (at times, **intentionally**), thereby blatantly violating numerous federal and/or states laws, rules, regulations, guidelines and/or statutes governed, administered and prosecuted by the following governmental agencies:

- The United States Department of Housing and Urban Development ("HUD");
- The Federal Housing Administration ("FHA");
- The United States Department of Agriculture ("USDA");
- The United States Department of Veteran Affairs ("VA");
- The Consumer Financial Protection Bureau ("CFPB");
- The Federal Trade Commission ("FTC"), specifically, Section 5 Unfair or Deceptive Acts or Practices ("UDAP"); **and/or**
- The California Department of Consumer Affairs ("CDCA").

Mr. Isaacson was in disbelief upon discovering the company's illegal business practices. These same unlawful business activities committed and continue to be committed by AFN, were also violations (breaches) of AFN's financial obligations to its private institutional investors, all of whom remain unaware of said illegal business practices since AFN illegally (and secretly) covered up its unlawful behavior. AFN's private institutional investors affected by its illegal business practices include, but are not limited to the following:

- PennyMac Corporation,
- Wells Fargo, N.A.,
- Flagstar Bank,
- Plaza Home Mortgage, Inc.,
- The Money Source,

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 11

- CMG Financial, Impac,
- Citibank, N.A.,
- Ditech Financial, LLC,
- Newrez, Inc.,
- Calber Home Loans, Inc.,
- JP Morgan Chase,
- Freedom Mortgage,
- Home Pointe Financial,
- Mr. Cooper,
- First Guaranty Mortgage Corporation,
- AmeriHome Mortgage Company, LLC,
- Texas Capital Bank,
- PHH Mortgage Corporation,
- BB&T Bank, Northpointe Bank, Fannie Mae ("FNMA") and
- Ginnie Mae ("GNMA").

15.     As a result of AFN's unlawful business practices, including reckless mortgage lending practices, which AFN concealed for years, it has resulted in tens of millions of dollars of illegal profit that continues to present.  In addition, it allowed AFN to avoid having to pay millions of dollars in fines and penalties from various federal and state agencies, including HUD, FHA, VA, CFPB, FTC and/or CDCA.

16.     On numerous occasions during Mr. Isaacson's employment tenure at AFN, and while he was under the direct supervision of some and/or all of the above-referenced AFN executives, including specifically Jack Sherman (AFN's

Founder and Chief Executive Officer) and John Sherman (AFN's President), Mr. Isaacson internally complained (and/or questioned) AFN's illegal, improper and unethical business practices.  In response, he was either asked to go along with business as usual or was told the matter in question would be corrected, which never occurred.   AFN's unlawful business practices continued despite Mr. Isaacson's internal questioning.

17.    Mr. Isaacson's first-hand knowledge of AFN's continued illegal business operation, coupled with his ongoing internal complaints forced AFN to ultimately terminate him in retaliation for his attempts to correct the unlawful business activity that he was witnessing.

## THE PARTIES

18.    Plaintiff Ian Isaacson is an individual and resident of the County of Orange and citizen of the State of California.  Furthermore, Mr. Isaacson was and continues to be a licensed and registered California real estate broker, including with the Nationwide Multistate Licensing System & Registry.

19.    AFN is a California corporation, organized under the laws of the State of California, operating at its primary place of business located at 10 Pointe Drive, Suite #330, in the City of Brea, State of California.  AFN is a non-bank mortgage origination company which has been in business for over 20 years.  AFN has been and continues to be a nationwide real estate mortgage banking firm with customers

throughout the entire United States.  On its company website, it boasts that its "*Mission is to be the best, most trusted, and admired mortgage lenders with unique, affordable and convenient products while maintaining a close, family-oriented culture.*"  AFN is among the largest non-bank mortgage origination companies in the United States.

20.     Co-Defendant JOHN SHERMAN, is an individual residing in the County of Orange and at all relevant times President of AFN.  Upon information and belief, Mr. Sherman is domiciled in California.  Mr. Sherman, along with the other individual named defendants listed below, personally informed Mr. Isaacson that AFN intended to enforce, and had in the past enforced, its unlawful de facto net branch operations schemes against AFN branch managers to be held personally liable for branch profitability and losses in violation of HUD regulations, in addition to the other name unlawful unethical business practices that it caused AFN to perform, all for its ill-gotten monetary gain.

21.     Co-Defendant JACK SHERMAN, is an individual residing in the County of Orange and current Founder and Chief Executive Officer of AFN. Upon information and belief, Mr. Sherman is domiciled in California.

22.     Co-Defendant JONATHAN GWIN, is an individual residing in the County of Orange and at all relevant times AFN's Chief Operating Officer.  Upon information and belief, Mr. Gwin is domiciled in California.

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 14

23.     Lastly, Co-Defendant TWYLA HANKINS, is an individual residing in the County of Orange and at all relevant times AFN's Executive Vice President of Operations.  Upon information and belief, Ms. Hankins is domiciled in California.

24.     Co-Defendants AFN, JOHN SHERMAN, JOHN SHERMAN, JONATHAN GWIN and TWYLA HANKINS are herein after collectively referred to as the "Defendants."

25.     Mr. Isaacson is informed and believes, and on that basis alleges, that the individual named defendants sued herein were responsible for AFN's unlawful conduct alleged herein, including but not limited to the false claims on which these claims are based.  Mr. Isaacson is further informed and believes, and on that basis alleges, that each named individual defendant conspired and acted in concert with each other to commit the wrongs against alleged herein, and in doing so were at all relevant times the agents, servants, employees, principals, joint venturers, alter ego, and/or partners of each other.  Mr. Isaacson is further informed and believes, and on that basis alleges, that in doing the things alleged in this Complaint, each named individual defendant was acting within the scope of authority conferred upon that Defendant by the consent, approval and/or transaction of the other individually named defendants, whether said authority was actual or apparent.

///

## **RELEVANT STATUES TO COMBAT MORTGAGE FRAUD**

26.    The False Claims Act provides liability for any person (i) who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" or (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B).

27.    The False Claims Act further has provided, at all times pertinent to this action, that for persons who violate the Act: "[such person] is liable to the United States Government for a civil penalty of not less that [$5,500] and not more than [$22,363]…plus three (3) times the amount of damages which the Government sustains because of the act of that person…." 31 U.S.C. § 3729(a).

28.    Congress enacted FIRREA in 1989 to reform the federal banking system.  Toward that end, FIRREA authorizes civil enforcement of enumerated criminal predicate offenses - - as established by a preponderance of the evidence - - that affect financial institutions and certain government agencies. *See* 12 U.S.C. § 1833(e).  To of the predicate offenses that can form the basis of liability under FIRREA are relevant here.  First, 18 U.S.C. § 1006 prohibits any person, who is "connected in any capacity with [HUD]" from "mak[ing] any false entry in any book, report or statement of or to [HUD]" with the "intent to … deceive any officer, auditor, examiner, or agent … of [a] department or agency of the United

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 16

States." Second, 18 U.S.C. § 1014 (as amended on July 30, 2008) prohibits any person from "knowingly mak[ing] any false statement or report … for the purpose of influencing in any way the action of [FHA]." *Id.*

29.     FIRREA provides that the United States may recover civil penalties of up to $1 million per violation, or, for a continuing violation, up to $5 million or $1 million per day, whichever is less.  The statute further provides that the United States can recover the amount of any gain to the person committing the violation, or the amount of the loss to a person other than the violator stemming from such conduct, up to the amount of the gain or loss.

## FACTUAL ALLEGATIONS RELATED TO ALL CAUSES OF ACTIONS

30.     AFN is a lender approved by United States Department of Housing and Urban Development ("HUD") to originate and underwrite single-family residential mortgage loans insured by Federal Housing Administration ("FHA"), knowingly approved loans that violated FHA rules while falsely certifying compliance with those rules during the Lending Time Period.  AFN's conduct allowed it to reap financial benefits from those loans, even if the borrowers defaulted on their mortgages, while placing all the risk arising from those loans on FHA -- a risk that resulted in tens of millions of dollars of losses to HUD.

31.     FHA promotes American homeownership through its "Direct Endorsement Lender" program or "DE Program". Under this program, FHA

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 17

insures loans so long as they satisfy certain requirements.  For these loans, FHA guarantees that mortgage holders will suffer no loss if the borrower ultimately does not repay the loan.  This program encourages lenders to extend loans to creditworthy low- and moderate-income families as well as first-time homebuyers.

32.   Under the DE Program, lenders known as Direct Endorsement Lenders (or "DE Lenders") apply for the responsibility to determine whether loans satisfy the requirements for FHA insurance.  Because DE Lenders are permitted to endorse loans for FHA insurance without prior HUD review, HUD requires these lenders to conduct due diligence on loans before endorsing them for FHA insurance and relies on the truthfulness of such lenders' loan specific certifications in extending mortgage insurance.  Any lender participating in the DE Program is expected and obligated to act with good faith, honesty, and fairness in its dealings with HUD.

33.   HUD's underwriting requirement ensure that creditworthy borrowers are able to handle monthly mortgage payments and become lasting homeowners while also protecting HUD and the taxpayers from improperly underwritten and unduly risky *unlawful* loans.  AFN underwriting of ineligible loans and false certifications of compliance with applicable requirements undermine these objectives, harming homeowners, the housing market, and the United States.

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 18

34.     AFN unlawfully failed to meet the obligations of its participation in the DE Program, and its management instituted and encourage practices that led underwriters to violate HUD rules and to approve ineligible loans.

35.     AFN's originations almost doubled between 2017 and 2008 and more than doubled between 2018 and 2019.  During these years of massive growth, AFN's top management  consistently prioritized financial profits at the expense of prudent underwriting.

36.     AFN accomplished its rapid growth through aggressively recruiting and purchasing new branches to originate more loans.  But AFN's audits of its branches showed consistent patterns of risk emerging from the branches.  More than a third  (or, 39 percent) of its branches during the Lending Time Period were found to impose a  "serious impact or risk to AFN" and AFN auditors discovered "serious concerns" about certain branches' lack of knowledge and/or controls.

37.     AFN established a culture that valued getting a loan approved and endorsed for FHA insurance over complying with FHA's rules.  AFN's aim was to shift risk from AFN to HUD on the mortgages it originated while making profits on those loans largely by selling them to institutional investors.

38.     AFN allowed and encouraged reckless origination and underwriting practices in the pursuit of growth including waiving mandatory conditions during the underwriting of FHA loans, allowing unqualified junior underwriters without

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 19

DE certifications to underwrite FHA loans, performing untimely and incomplete quality control reviews, and ignoring quality control findings.

39.    AFN's own quality control vendors found significant deficiencies in 21 percent of the FHA loans they reviewed during the Lending Time Period and found over half the FHA loans reviewed during the Lending Time Period contained significant or moderate deficiencies, including violations of FHA underwriting requirements.

40.    AFN allowed its underwriters to waiver required loan conditions, including conditions that were mandatory FHA requirements.  These conditions could be and were waivered in an underwriter's discretion without any review or approval by management.

41.    AFN also created a position called a "junior underwriter" to assist DE certified underwriters.  On FHA loans that AFN manually underwrote, where FHA requires all underwriting by a DE underwriter, AFN allowed junior underwriters to clear underwriting conditions.  While the use of junior underwriters itself violates FHA requirements, AFN's practices further compounded its violations as junior underwriters often ignored and violated FHA guidelines when clearing conditions.

42.    AFN was aware of its unlawful business activity concerning its systematic problems, but ignored the problems and failed to take appropriate steps to remedy them consistent with its obligations to HUD.  Indeed, AFN implemented

a quality control process that failed to adequately assess its compliance with FHA requirements.  AFN consistently performed quality control late and failed to report quality control results to management in many quarters during the Lending Time Period.

43.    Despite having an obligation to report all materially defective loans to HUD, AFN did not report a single underwriting deficiency to the agency during the Lending Time Period, even though materially defective loans were identified by AFN employees, including Mr. Isaacson.  Indeed, during the Lending Time Period, AFN opted to hide its underwriting problems from HUD rather than disclose them.

44.    AFN's knowledge of its poor underwriting practices derived not just from its internal audits and deficient quality control processes.  AFN regularly received reports from institutional investors identifying the poor quality of its loans, including FHA loans.  The findings in these reports often resulted in investors requesting AFN to re-purchase loans it had sold due to underwriting issues, including failures to meet FHA's mandatory requirements.  Despite learning of these issues, AFN did not engage in any systematic effort to improve its underwriting, allowing its poor underwriting and its specific FHA violations to fester.

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 21

45.     AFN further unlawfully executed residential home loan documents using Adobe Acrobat Software to fraudulently re-create customer signatures that were inserted on said documents without customer approval or knowledge.  In this regard, AFN knowingly misled its institutional investors (*PennyMac Corporation, Wells Fargo, N.A., Flagstar Bank, Plaza Home Mortgage, Inc., The Money Source, CMG Financial, Impac, Citibank, N.A., Ditch, Newrez, Inc., Calber Home Loans, Inc., JP Morgan Chase, Freedom Mortgage, Home Pointe Financial, Mr. Cooper, First Guaranty Mortgage Corporation, AmeriHome Mortgage Company, LLC, Texas Capital Bank, PHH Mortgage Corporation, BB&T Bank, Northpointe Bank, Fannie Mae (FNMA) and Ginnie Mae (GNMA)*) by knowingly certifying loan characteristics and manipulated its origination software program with HUD to illegally profit.  It also falsified its internal computer system to prevent disclosing material information to its customers.

46.     As detailed below, AFN misrepresented its loan origination services to United States veterans by knowingly promoting loan characteristics that could not be satisfied.

47.     As further detailed below, AFN failed to report a large data theft to its customers and/or the United States Government and in the alternative, unlawfully shared confidential consumer data information with its illegal branch offices for profit in violation of state and federal laws.

48.     Lastly, AFN defrauded the Department of Homeland Security by knowingly submitting fraudulent employment documents related to the procurement of an H1B Visa for Ikakyi Gonzalez.

**DEFENDANTS RETALIATED AGAINST MR. ISSACSON BY WRONGFULLY TERMINATED HIM AFTER HE REPORTED AFN'S UNLAWFUL BUSINESS  PRACTICES**

49.     On or about March 9, 2020, after months of complaining of various unlawful business activity at AFN, Jonathan Gwin (AFN's Chief Operating Officer) called Mr. Isaacson to inform him that he was going to meet him at AFN's Lake Forest Branch Office to discuss the byproducts of AFN's manipulating its Encompass internal system, which resulted in hundreds of thousands of dollars in lost wages and bonuses to Mr. Isaacson and millions of dollars lost to its other Regional and Branch Managers.  Upon Mr. Gwin's arrival, he was accompanied by Matt Gruber (AFN's Director of Technology).  Instead of meeting Mr. Isaacson to discuss AFN's unlawful business practices, they instead seized over twenty (20) personal computers and two (2) large computers servers containing unlawful documentation, including proof of the various unlawful business activities that Mr. Isaacson was complaining about for months.  Mr. Gruber personally cut the connections to the branch office's audio and video security systems.  Mr. Gwin then wrongfully terminated Mr. Isaacson after he continued to question him regarding AFN's intentional manipulation of its Encompass internal system and

other data theft that was never reported to the United States government.  Mr.
Isaacson is entitled to monetary damages, restitution and injunctive relief.

## I.     FHA MORTGAGE INSURANCE PROGRAM.

50.     Due to its size and to further homeownership opportunities for
taxpayers, the FHA mortgage insurance program necessarily relies on lenders in
making and insurance FHA loans to act responsibly, exercise due care, comply
with FHA requirements, and make truthful certifications.

### A.     Overview of the FHA Mortgage Insurance Program, the DE program, and the LI Program.

51.     HUD is a cabinet-level agency of the United States.  Its mission is to
create strong, sustainable, inclusive communities and quality affordable homes for
all.  HUD works to strengthen the housing market to bolster the economy and
protect consumers nationwide, meet the need for quality affordable rental homes,
utilize housing as a platform for improving quality of life, and business inclusive
and sustainable communities free from discrimination.

52.     FHA is part of HUD and is one of the largest mortgage insurers in the
world.  Pursuant to the National Housing Act of 1934, FHA offers several
mortgage insurance programs that have insured more than 40 million home loans
since FHA's inception.  Through some of these mortgage insurance programs,
FHA provides insurance against losses on mortgage loans to single family home
buyers on mortgages originated and held by approved lenders.

53.     If a homeowner defaults on an FHA-insured mortgage, the holder of the mortgage may submit a claim to HUD.  HUD will then pay the mortgage holder the outstanding balance on the loan and other costs associated with the default.  The mortgage holder therefore suffers no loss when a borrower is unable to repay an FHA-insured mortgage.  This no-loss guarantee encourages lenders to make loans to creditworthy applicants who would be otherwise have difficulty qualifying for conventionally available financing on favorable terms, including the ability to put little money down to make the purchase.  FHA mortgage insurance programs therefore help many creditworthy moderate-and low-income families as well as first-time homebuyers become homeowners.  The DE Program is voluntary and gives lenders access to borrowers and revenue streams lenders would be unlikely to access without the support of HUD programming and FHA insurance.

54.     A lender must apply to be a DE Lender and must be approved by HUD to underwrite FHA-insured mortgage loans on HUD's behalf.  This is an important responsibility because HUD "does not review applications for mortgage insurance before the mortgage is executed." 24 C.F.R. §203.5(c).  Pursuant to its statutory authority, HUD has published guidelines for Direct Endorsement underwriting procedures in the handbook for distribute to DE Lenders. *Id.* "Compliance with these guidelines is deemed to be the minimum standard of due diligence in underwriting mortgages." *Id.* Mortgages must evaluate the

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 25

mortgagor's income "in accordance with applicable regulations, policies and procedures," 24 C.F.R. §203.5(d), and must have the property appraised "in accordance with such standards and requirements as the Secretary may prescribe," 24 C.F.R. §203.5(e).

55.    After the DE Lender approves a borrower for an FHA-insured mortgage loan, the lender may submit the mortgage loan to HUD to "endorse" the mortgage loan for FHA insurance, meaning that the mortgage loan is fully insured by the FHA insurance fund in the event that the borrower cannot repay the loan. The DE Lender must certify that the loan meets all of HUD's requirements and HUD relies on this certification to endorse the loan for FHA insurance.

56.    Certain DE Lenders apply to, and participate in, the Lender Insurance ("LI") program (the "LI Program") in which the mortgagees themselves endorse mortgage for FHA insurance and retain all documentation supporting the mortgage. 24 C.F.R. §203.6. These lenders typically have a history with HUD and are experienced with FHA lending and so are afforded greater responsibility based on previous representations to HUD. The lender retains the documents necessary to approve the loan (the FHA "case binder")  and remits the documents to HUD only upon request. *See* Mortgagee Letter 2005-36.

57.    A DE Lender is expected and obligated to act with the utmost good faith, honesty, and fairness in its dealings with HUD.  The mortgagee, knowing

that the federal insurer is relying on its professional judgment in a business relationship, has an affirmative duty to use due care in providing information and advice to the federal mortgage guarantor.  As a result, in addition to the regulatory duties addressed below, the DE Lender owes both a fiduciary duty and a duty of reasonable care to HUD.

58.     Put another way, HUD grants DE Lenders responsibility for determining which loans qualify for FHA insurance.  In granting this control and responsibility to the DE Lenders, HUD must rely on and place trust and confidence in the lenders' knowledge, good faith, integrity, and candor.  HUD therefore enters into a fiduciary relationship with the DE Lenders.

59.     As a result of this fiduciary relationship, the DE Lenders owe HUD a duty to act with good faith, candor, honesty, integrity, fairness and fidelity in their dealings with HUD.  These duties require, among other things, that the lenders exercise integrity, prudence, candor, and due diligence on behalf of HUD when endorsing loans for FHA insurance, reviewing the loans for quality control purposes, reporting defective loans, and submitting claims.

**B.     Lenders Must Submit Truthful Certifications.**

60.     The success of the DE program depends upon proper underwriting of loan files.  Participating lenders determine the eligibility of borrowers and loans for

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 27

FHA insurance, and ensure the integrity of the data relied upon to make such determinations.

61.    Under the DE Program, HUD relies on the expertise and knowledge of the lenders.

62.    Indeed, as noted below, HUD requires DE and LI Lenders to certify on an annul basis that they are fully aware of HUD requirements and will fully comply with them.

63.    HUD also relies on the truthfulness of the certification the lender completes on each loan certifying that the loan is eligible for FHA insurance.  AS HUD has explained, these "certifications are important as HUD will rely upon them for purposes of endorsing the mortgage loan, thereby eliminating the necessity for a detailed HUD review of the loan prior to endorsement."  Final Rule, Mutual Insurance Programs Under the National Housing Act; Direct Endorsement Processing, 48 Fed. Reg. 11932 (March 22, 1983).

**C.    Lenders Must Use Qualified Underwriters.**

64.    To obtain and maintain its status as a DE Lender, a lender must have qualified underwriters on staff.

65.    To qualify as a Direct Endorsement underwriter or "DE underwriter," an underwriter must satisfy several requirements.  The DE underwriter "must have a minimum of three years full-time recent experience (or equivalent experience)

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 28

reviewing both credit applications and property appraisals." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.A.3; *see also* HUD Handbook 4155.2 ch. 2.A.4a. The underwriter must also be a "reliable and responsible professional skilled in mortgage evaluation" and "must be able to demonstrate his or her knowledge and experience regarding the principles of mortgage underwriting." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.A.1; *see also* HUD Handbook 4155.2 ch.2.A.4.a.

66.    Lenders cannot offer underwriters improper incentives to approve loans. Specifically, "[e]mployees who perform underwriting and loan servicing activities may not receive commissions." HUD Handbook 4060.1, REV-2, ch. 2-9.A. Lenders are not allowed to provide bonuses based on loans an underwriter approves.

67.    These requirements are intended to ensure that FHA-insured loans are underwritten only by qualified individuals who are knowledgeable and experienced regarding FHA requirements, and that the decision to endorse the loan is based on the eligibility of the mortgage rather than the financial interest of the underwriter.

**D.    Lenders Must Perform Proper Due Diligence and Ensure Accuracy.**

68.    A DE Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage. That responsibility includes performing due diligence and ensuring accuracy of

underlying documentation, as it would for the underwriting of any loan.

69.    Proper due diligence is a critical component of the DE Program and any mortgage lending program.  It is required by federal regulation and HUD Handbooks.  It is also required by the fiduciary duty and duty of reasonable care that the DE Lenders owed to HUD.  *See* 48 Fed. Reg. at 11932 ("The duty of due diligence owed [HUD] by approved mortgagees is based not only on these regulatory requirements, but also a civil case law.").  The entire scheme of FHA mortgage guaranties presupposes an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in good faith after due consideration of the facts found.

70.    In all cases, a DE Lender owes HUD the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investments."  24 C.F.R. §203.5(c).

71.    HUD has established specific rules for due diligence predicated on sound underwriting principles.  In particular, HUD requires DE Lenders to be familiar and to fully comply with governing HUD Handbooks and Mortgagee Letters, which provide detailed instructions and requirements for DE Lenders.

These requirements set forth the minimum standard of due diligence in underwriting mortgages with which DE Lenders must comply.

72.     HUD considers the DE underwriter to be "the focal point of the Direct Endorsement program."  HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.C.  The DE underwriting must assume the following responsibilities:

-compliant with HUD instructions, the coordination of all phases of underwriting, and the quality of decisions made under the program;

-the review of appraisal reports, compliance inspections and credit analyses performed by fee and staff personnel to ensure reasonable conclusions, sound reports and compliance with HUD requirements;

-the decisions relating to the acceptability of appraisal, the inspections, the buyer's capacity to repay the mortgage and the overall acceptability of the mortgage loan for HUD insurance;

-the monitoring and evaluation of the performance of fee and staff personnel used for the Direct Endorsement program; and

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 31

> -awareness of the warning signs that may indicate
>
> irregularities, and an ability to detect fraud, as well
>
> as the responsibility that underwriting decisions are
>
> performed with due diligence in a prudence manner.
>
> *Id.*

73.    When ensuring that a borrower is creditworthy, a DE Lender must comply with governing HUD requirements, such as those set forth in HUD Handbook 4155.1 (Mortgage Credit Analysis for Mortgage Insurance on One- to Four-Unit Mortgage Loans).  The rules set forth in HUD Handbook 4155.1 exist to ensure that a DE Lender sufficiently evaluates whether a borrower has the ability and willingness to repay the mortgage debt.  HUD has informed DE Lender that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

74.    DE Lenders can underwrite an FHA-insured loan in one or two ways.  First, a DE underwriting can "manually underwrite" the loan, by making the credit decision whether to approve the borrower, in accordance with HUD underwriting rules.  Second, the DE Lender can use a HUD-approved Automated Underwriting System ("AUS"), a software system that indicates the determination of a loan's eligibility for FHA insurance.

56.     To "manually underwrite" an FHA-insured loan, there are numerous steps the DE underwriter must take.  At a minimum, the underwriter must:

- obtain and review the borrower's credit history, including the borrower's payment history of housing obligations;

- obtain adequate explanations for major derogatory credit, including collections, judgments, and other recent credit problems;

- analyze the borrower's debt obligations;

- reject documentation transmitted by unknown or interested parties;
- inspect documents for proof of authenticity;

- verify the borrower's employment history;

- establish the borrower's income stability and make income projections;

- ensure that the borrower has invested a minimum required amount of his or her own funds in the transaction;

- document the source of funds invested in the transaction, including any gift funds;

- calculate debt and income ratios and compare those ratios to fixed ratios set by HUD rules; and

- consider and document any compensating factors permitting deviations from those fixed ratios.

*See* HUD Handbook 4155.1.

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 33

57.     Beginning in July 2008, HUD required DE Lenders to electronically process eligible loan requests through an AUS.  An AUS is a software system that connects to a proprietary HUD algorithm known as Technology Open to Approved Lenders, or "TOTAL."  Using the data the lender inputs, HUD's "TOTAL" algorithm makes a credit determination and either: (i) provides an "Accept/Approve" decision, approving the loan subject to certain conditions; or (ii) provides a "Refer" decision, referring to loan back to the lender for manual underwriting.  When TOTAL approves the loan, the approval is conditioned on the lender completing certain additional underwriting steps.  Many of these conditions relate to ensuring the data the lender entered is true, complete and accurate.

58.     Numerous requirements promulgated by HUD explain how lenders must calculate each data point and what documentation they need to support each data point.

59.     For any loan approved through the use of an AUS, HUD requires the lender to certify to the integrity of the data it entered, which HUD defines as data that is true, complete and accurate.  FHA TOTAL Mortgage Scorecard User Guide (December, 2003 Edition), ch. 2.  If the lender later receives or learns of information that materially differs from the information previously entered by the lender, the lender must re-summit a proposed loan to TOTAL through an AUS.

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 34

60.     The data entered into TOTAL is material to the endorsement of the loan because TOTAL is an algorithm that evaluates the overall creditworthiness of mortgage applicant based on the data supplied by the lender.  Therefore, a loan receiving a TOTAL "Accept/Approve" decision is only eligible for FHA's insurance endorsement if "the data entered into the AUS [is] true, correct, properly documented, and accurate." *See* Mortgagee Letter 2004-1.

61.     Because TOTAL cannot analyze data that is not available to it, certain loans are not eligible for an AUS approval and must be manually underwritten.  "A manual downgrade becomes necessary if additional information, not considered in the AUS decision, affects the overall insurability or eligibility of a mortgage otherwise rated as an accept or approve."  FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2.  While lender is not required to have a DE underwriter review the credit portion of an AUS approved loan, a lender must have qualified staff review AUS approvals to ensure a loan that receives an "Accept/Approve" decision is in fact eligible for an AUS approval. *See id.*

62.     To ensure the integrity of TOTAL's decision, as well as the integrity of the data TOTAL relies upon, lenders are prohibited from "manipulating … application variable [in] TOTAL mortgage scorecard to obtain an accept/approve risk classification." *See* Mortgagee Letter 2005-15.

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 35

63.     If TOTAL does not approve a loan with an "Accept/Approve"

decision, it returns a "Refer" decision, meaning the loan is referred back to the

lender for manual underwriting.  Lenders must then have a DE underwriter

perform a manual underwrite and determine if the loan is approvable under FHA's

manual underwriting requirements.  *See* 24 C.F.R § 203.255(b)(5)(i)(B).

**E.      FHA Requires Lenders to Certify Their Compliance with
          Their Programmatic Responsibilities.**

64.     HUD requires DE Lenders to certify their compliance with the

foregoing due diligence, quality control, and reporting requirements.

65.     First, when a lender applies to participate in the DE Program and to

endorse loans for FHA insurance on HUD's behalf, the lender must certify that it

will full comply with all HUD guidelines, regulations and requirements:

> "I certify that, upon the submission of this
>
> application, and with its submission of each loan for
>
> insurance or request for insurance benefits, the
>
> applicant has and will comply with the requirements
>
> of the Secretary of Housing and Urban
>
> Development, which include, but are not limited to,
>
> the National Housing Act (12 U.S.C. § 1702 *et seq.*)
>
> and HUD's regulations, FHA handbooks, mortgagee

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 36

letters, and Title I letters and policies with regard to

using and maintaining its FHA lender approval."

This certification is submitted to HUD headquarters in the District of

Columbia.

66.     If the lender is approved, the lender must re-certify, every year, that it

is complying with the program's qualification requirements, including due

diligence in underwriting and the implementation of a mandatory quality control

plan.  From 2007 to 2009, the lender was required to certify:

"I know or am in the position to know, whether the

operations of the above-named mortgagee conform to

HUD-FHA regulations, handbooks, and policies.  I

certify that to the best of my knowledge, the above

named mortgagee conforms to all HUD-FHA

regulations necessary to maintain its HUD-FHA

approval, and that the above-named mortgagee is

fully responsible for all actions of its employees

including those of its HUD-FHA approved branch

offices."

This language was altered in 2010, requiring the lender to certify:

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 37

"I certify that I know, or am in the position to know,

whether the operations of above-named lender conform to

HUD-FHA regulations, handbooks, Mortgagee Letters, Title

I Letters, and policies; and that I am authorized to execute

this report on behalf of the lender.  I certify that the lender

complied with and agrees to continue to comply with HUD-

FHA regulations, handbooks, Mortgagee Letters, Title I

Letters, policies, and terms of any agreements entered into

with [HUD].  I certify that to the best of my knowledge, the

above-named lender conforms to all HUD-FHA regulations

necessary to maintain its HUD-FHA approval, and that the

above-named lender is fully responsible for all actions of its

principles, owners, officers, directors, managers,

supervisors, loan processors, loan underwriters, loan

originators, and all other employees conducting FHA

business for the above-named lender…Each of my

certifications is true and accurate to the best of my

knowledge and belief.  I understand that if I knowingly have

made any false, fictitious, or fraudulent statement(s),

representation, or certification on this form, I may be subject

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 38

to administrative, civil and/or criminal penalties; including debarment, fines, and imprisonment under applicable federal law."

These certifications are then submitted to HUD headquarters in the District of Columbia.

67.     Unless the lender submits a truthful initial certification and annual certifications, the lender is not entitled to obtain or maintain its status as a DE Lender or to endorse loans for FHA insurance.

68.     In addition, for each individual mortgage loan approved for FHA insurance, the lender must make a "loan-level" certification – i.e., a certification specific to an individual loan – that the individual mortgage complies with HUD rules and its "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD-92900-A.

69.     The "loan-level" certification differs depending on whether the lender used an AUS or manual underwriting. For each loan that was underwritten with an AUS, the lender must certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." *Id.* For each loan that required manual underwriting, the lender must certify that the DE underwriter "personally reviewed the appraised report (if applicable), credit application, and

all associated documents that ha[s] used due diligence in underwriting th[e] mortgage." *Id.*

70.    For all loans, the mortgagee's representative must certify: "I, the undersigned, as authorized representative of mortgagee at this time of closing of this mortgage loan, certify that I have personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents. I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4." If the loan does not meet applicable HUD requirements, it is not eligible for FHA insurance and cannot be certified for endorsement. As of May 9, 2009, HUD Handbook 4000.4 was superseded by HUD Handbooks 4155.1 and 4155.2.

71.    Absent the applicable certifications for an individual loan as described in hereinabove, the DE Lender cannot endorse that loan for FHA insurance.

72.    Each of the foregoing certifications is material to HUD's payment of any claim submitted under the DE Program. Generally, for DE and LI Lenders, HUD does not review FHA loans for approval prior to the loan being endorsed for insurance or paying claims in the event of a default. Instead, HUD relies on its lenders to comply with its requirements and to ensure that every loan is in fact eligible for FHA insurance. The certifications (i) are critical to HUD's ability to

ensure that only qualified and eligible loans are endorsed for HUD insurance; (ii) are essential for a claim on a loan to be eligible for FHA insurance; and (iii) are needed to protect HUD and the FHA insurance fund from undue risk and loss.

**F.** **HUD regulations prohibit the unlawful "net branching" and require HUD-approved lenders to pay all operating expenses for its branches and forbade lenders from shifting liability of those expenses to the branch or its employers.**

73.     HUD through the FHA issues a handbook that regulates lenders for FHA-backed loans.  The HUD regulations prohibit the unlawful "net branching." *See* FHA Single Family Housing Policy Handbook 4000.1, Section I.A.4.d (Net Branching Prohibition) and I.A.6.G (Payment of Operating Expenses.  The FHA Updated Handbook expressly required HUD-approved lenders to pay all operating expenses for its branches and forbade lenders from shifting liability of those expenses to the branch or its employees.  More specifically, Section I.A.6.g.ii required that "The mortgagee must pay all of its own operating expenses, including the expenses of its corporate office and any branch offices where  it conducts FHA business."  Another section of that handbook, Section I.A.6.g.i, expressly defined "operating expenses" as "the costs associated with equipment, furniture, office rent, overhead, and employee compensation."  These provisions merely echoed and continued the "net branching" which had been set forth in HUD regulations for a decade.

74.     The previous iteration of the FHA handbook was in effect from August 2006 to September 2015.  *See* FHA Title II Mortgagee Approval Handbook 4060.1, Rev-2 (Aug 14, 2006) ("FHA Handbook").  Pursuant to that FHA Handbook, for each branch office, the mortgagee must submit a form (Form 92001-B) to HUD containing basis information about the branch, general certification that the branch "meets all HUD/FHA requirements," and a specific certification that the lender "will pay all operating costs of the branch office." FHA Handbook ¶ 5-7 at 5-11.  The FHA Handbook expressly provides that:

a.      "**2-8 Operating Expenses.**  A mortgagee must pay all its own operating expenses.  This includes expenses of its main and branch offices involved in originating or servicing any FHA insured mortgages.  Operating expenses include, but are not limited to, equipment, furniture, office rent, overhead, employee compensation, and similar expenses."

b.      "**2.14 Prohibited Branch Arrangement.**  An approved mortgagee may not originate, or service FHA insured mortgages from branches that do not meet FHA requirements…"

c.      "**B.  Certain Employment Agreements.**  An FHA approved mortgagee must pay all of its operating expenses including the compensation of all employees of its main and branch office.  Other operating expenses that must be paid by the FHA approved mortgagee include, but are not limited to,

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 42

equipment, furniture, office rent, utilities and other similar expenses incurred in operating a mortgage lending business. ***A branch compensation plan that includes the payment of operating expenses by the branch manager, any other employee or by a third party is prohibited arrangement.***" (emphasis added).

75.     HUD has clarified that the FHA Updated Handbook did not change these important regulations prohibiting net branching.  For example, in a public presentation dated June 23, 2015, regarding the then upcoming FHA Updated Handbook, HUD's FHA Office of Single Family Housing reported under the heading "Doing Business: Key Policy Revisions" that the new handbook "Continues to prohibit Net Branching arrangements."

76.     The purpose of requiring the lender to pay operating costs of its branch office is to prevent the lender from operating "net branch" or "franchise" offices that provide a potential revenue stream at little cost to the lender.  It is critically important that although lenders are permitted to pay branch managers the commission resulting from branch revenue minus branch expenses, they must remain the financially responsible party and be the ultimate guarantor on branch contractual obligations.  If a Lender is permitted to operate "no cost" or "partial cost" branches, it will have an incentive to add far more branches than it can effectively supervise and control.

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 43

77.     After submitting the certification, the loan correspondence receives a HUD ID that permits the branch to originate FHA loans. To monitor lender default rates on a branch-by-branch basis, HUD requires lenders to enter the specific HUD ID for the originating branch in every loan file submitted to HUD and to certify that each loan has satisfied HUD's regulations.

78.     To maintain HUD-approved status, loan correspondents and direct endorsement lenders must also submit annual certifications to HUD. The annual certifications contain four distinct representations:

    a.      "I certify that none of the principals, owners, officers, directors, and/or employees of the above-named lender is currently involved in a proceeding and/or investigation that could result, or has resulted in a criminal conviction, debarment, limited denial of participation, suspension, or civil money penalty by a federal, state or local government."

    b.      "I certify that the above named lender has not been refused a license and has not been sanctioned by any state(s) in which it originates and/or services HUD-FHA insured loans."

    c.      "I know, or am in the position to know, whether the operations of the above named lender conform to HUD-FHA regulatiions, handbooks, and policies."

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 44

d.     "I certify that to the best of my knowledge, the above

named lender conformed to all HUD-FHA regulations necessary to

maintain its HUD-FHA approval, and that the above named lender

is fully responsible for all actions of its employees including those

of its HUD-FHA approved branch offices."

79.     The requirements for both loan correspondents and direct

endorsement lenders to maintain HUD-FHA approval is that they implement a

quality control program, which, among other things, ensures compliance with

certain key HUD requirements.

80.     As part of its quality control program, a mortgagee must (a) conduct

an on-site audit of all branch offices within 90-days of opening and annually

thereafter; (b) review 10% of all closed loan files to ensure they were underwritten

in accordance with HUD guidelines; and (c) review all early payment defaults

(i.e., those that default within the first six months.).  Review of early payment

defaults are particularly important because such defaults are indicative of

mortgage fraud.

80.     For years, AFN has falsely certified its HUD requirements, in

addition to a regular practice requiring its Branch Manager to pay for AFN

customer's mortgage payments that were delinquent.  In fact, as is discussed

below, AFN's written policy that is incorporated in its Branch Manager

employment agreements unlawfully state that AFN Branch Manager pay [sic] "Actual corporate costs for any early payoffs (EPO), early payment defaults (EPD), buybacks, or any other expenses incurred on loans closed by the Branch."

80.    AFN also illegally charged its Branch Managers, including Mr. Isaacson, for AFN's Early Payoffs and AFN's Early Payment Default that came as a byproduct of AFN's underling illegal business activities.

80.    Although AFN claims to have a written policy of reviewing 10% of all closed loans and completing an annual audit of its Net Branches, this never occurred.  In fact, AFN unlawfully automatically charged its Branch Managers, including Mr. Isaacson, an Audit Fee per month, which was calculated at $12.50 per funded residential home loan, when in fact AFN never conducted the required audit.   AFN has illegally enriched itself with these unlawful business practices, all of which are in direct violation of HUD guidelines.

81.    Each loan filed and submitted for FHA insurance contain a loan-specific certification (Form 92900-A), in which a lender certifies that the information contained in the application is "true and to the best of the lender's knowledge and belief."  If, when the loan "is submitted [to HUD] for endorsement, HUD has evidence that there is fraud or misrepresentation on the part of the origination mortgagee, HUD will consider the certifications as

fraudulent and will not endorse the mortgage for insurance." *See* FHA Handbook ¶ 1-3.

82.    In the event that a borrower defaults on an FHA-insured mortgage, the holder of the loan submits a claim to HUD for the costs associated with the defaulted mortgage and the sale of the property.  HUD then pays off the balance of the mortgage and other related costs, and may assume ownership of the property.  In the mortgage industry, FHA-insured loans are highly marketable for resale to investors both because such loans are expected to have met HUD requirements and because they are backed by the full faith and credit of the United States.

### G.    HUD regulations prohibit the unlawful "virtual branching."

83.    AFN violates state and federal law, including HUD regulations prohibiting virtual branching, and the proper disclosure and requirements for proper AFN Branch licenses.  In this regard, AFN purposely allows certain new Branches to illegally operate in such a fashion pending the legitimate Branch license to be procured from respective state regulators.

## II.    AFN'S PARTICPATION IN THE FHA PROGRAM

84.    AFN began participating in the DE Program and in the Lender Insurance Program in well beyond the Lending Time Period.  During the Lending Time Period, AFN underwriting primarily took place at its corporate headquarters

in Brea, although underwriting also occurred at certain branch offices, including the branch office that Mr. Isaacson acted as Branch Manager for AFN.

**A.    AFN Directly Endorsed FHA Loans, Many of Which Have Defaulted, Requiring FHA to Pay Substantial Insurance Claims.**

85.    After endorsing a loan for FHA insurance or causing it to be endorsed, AFN often sold the loan to large institutional investors located throughout the United States.

86.    AFN profited both by charging loan fees and by selling the FHA-insured loans.

**B.    AFN Certified That it Complied With HUD Requirements to Gain and Maintain Eligibility in the DE Program.**

87.    To become and remain a HUD-approved DE Lender, and to receive payment on claims for defaulted FHA-insured loans that are held, AFN was required to annually certify its compliance with HUD's requirements.

88.    For example, AFN certified to HUD for fiscal year ("FY") 2017 that:

"I know, or am in the position to know, whether the operations of [AFN] conform to HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, and policies [.]…"

"I certify that to the best of my knowledge, [AFN] conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA

approval, and that [AFN] is fully responsible for all actions of is

principals, owners, officers, directors, and all other employees

conducting FHA business for [AFN] in all of its offices where it

performs any functions of an FHA-approved lender."

89.     AFN made similar certifications for FY 2017, FY 2018, FY 2019 and 2020.

90.     The foregoing certifications were knowingly false because, as discussed below, AFN knew, deliberately ignored, or recklessly disregarded that it originated and underwrote loans that were not in compliance with HUD requirements.

///

///

///

///

///

///

///

///

///

///

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 49

## EXAMPLES OF DEFENDANTS UNLAWFUL BUSINESS PRACTICES

**III.   AFN     UNLAWFUL     BUSINESS     PRACTICES INTENTIONALLY     DEFRAUTED     HUD,     FHA INSURANCE,  INSTITUTIONAL  INVESTORS  AND CUSTOMERS**

92.     AFN has, for years, intentionally defrauded HUD, FHA Insurance, institutional investors and customers with a variety of unlawful practices, all for its ill-gotten gain.

**A.     AFN's Intentional Unlawful Conduct Violated HUD Rules and Requirements Governing the Origination and Underwriting of FHA Insured Mortgages by Falsifying Documents and Providing False Annual Certifications to HUD.**

93.     AFN knowingly falsified consumer loan documents by transposing customer signatures from a Borrowers Authorization Form to a Closing Disclosure statement to reduce operational costs and illegally increase profit.  In or about November 2017, Mr. Isaacson discovered that AFN regularly disregarded state and federal laws by fraudulently changing consumer signatures using *Adobe Acrobat Pro* to facilitate this unlawful activity and prevent detection from any state, federal, including HUD, as well as, from institutional investor audits from PennyMac Corporation, Wells Fargo, N.A., Flagstar Bank, Plaza Home Mortgage, Inc., The Money Source, CMG Financial, Impac, Citibank, N.A., Ditech Financial, LLC Financial, LLC, Newrez, Inc., Calber Home Loans, Inc., JP Morgan Chase, Freedom Mortgage, Home Pointe Financial, Mr. Cooper, First

INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 50

Guaranty Mortgage Corporation, AmeriHome Mortgage Company, LLC, Texas Capital Bank, PHH Mortgage Corporation, BB&T Bank, Northpointe Bank, Fannie Mae (FNMA) and Ginnie Mae (GNMA).

94.     Raul Esperaza (AFN's Branch Relations Manager) informed Mr. Isaacson of the detailed process of how AFN fraudulently deceives federal and state laws by manipulating prior customer signatures from other loan related documents that AFN procure to the Closing Disclosure statement.  Mr. Esperaza stated to Mr. Isaacson that Jonathan Gwin (AFN's Chief Operating Officer) knew of this unlawful behavior and endorsed it.  He instructed Mr. Isaacson to never discuss this subject matter or any other AFN unlawful activity via email, and to use text, cell phone or informal meetings at AFN's corporate headquarters in Brea, California.

95.     Immediately thereafter, Mr. Isaacson called Mr. Gwin to question about this AFN's business of changing the closing disclosure dates and changing the date tracking (the compliance screen-"Date Tracking") and most important his concern about getting in trouble with the law, in particular, TRID, which Mr. Isaacson knew.  In response, Mr. Gwin stated "Do you want to pay the extra $2,000.00 dollars to fund the loan" [referring to the fraudulent loan documents and the branch relations department altering documents using *Adobe Acrobat Pro.*

96.     On this unlawful activity alone, AFN generated millions of dollars

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 51

unlawfully funding loans and thereafter selling these same defective loans to institutional investors, Ginnie Mae and Fannie Mae. This unlawful activity resulted in false claims to HUD.

97.     *Mr. Isaacson is in possession of four thousand five hundred sixty-nine (4,569) scans and facsimiles from AFN's Brea headquarter (specifically, from the Branch Relations Department, which is situated next to Jonathan Gwin (AFN's Chief Operating Officer) office). This includes numerous PDF's of AFN's fraudulently created, manipulated and/or altered consumer Closing Disclosures on certain AFN funded loans that were insured by the FHA and/or were unknowingly purchased by institutional investors PennyMac Corporation, Wells Fargo, N.A., Flagstar Bank, Plaza Home Mortgage, Inc., The Money Source, CMG Financial, Impac, Citibank, N.A., Ditech Financial, LLC, Newrez, Inc., Calber Home Loans, Inc., JP Morgan Chase, Freedom Mortgage, Home Pointe Financial, Mr. Cooper, First Guaranty Mortgage Corporation, AmeriHome Mortgage Company, LLC, Texas Capital Bank, PHH Mortgage Corporation, BB&T Bank, Northpointe Bank, Fannie Mae ("FNMA") and Ginnie Mae ("GNMA").*

///

///

///

**B.**     **AFN's Wrongful Conduct Violated Specific HUD Rules and Requirements Governing the Origination and Underwriting of FHA Insured Mortgages by altering the Encompass Date Tracking.**

98.     From in or about July 2017, and continuing through Mr. Isaacson's employment at AFN, AFN intentionally deceived HUD, the FHA, institutional investors and customers by fraudulently altering the date tracking in its Ellie Mae loan origination software, *to wit*, Encompass Loan Origination System (i.e., the "System of Record). This was done to prevent detection of its illegal business practices by the federal government, institutional investors and its customers nationwide. The task was performed by Raul Esperaza (AFN's Branch Relations Manager), who admitted conducting this unlawful activity to Mr. Isaacson on many occasions. He also assisted in the manipulation of the compliance and date tracking system to fund a particular AFN residential home loan. This act was done by Mr. Esperaza and Brandon Johnson (former AFN Branch Relations employee) at AFN Brea headquarters at the instruction of Jonathan Gwin (AFN's Chief Operating Officer) and Jimmy Voung (AFN's Branch Compliance Supervisor) in order to reduce lock, hedge and operational costs, and for an ill-gotten gain. It should be noted the Mr. Esperaza and Mr. Johnson's respective offices were within several feet of Mr. Gwin, making it easy for Mr. Gwin to conspire with these AFN employees off-the-record.

99.     During at least a one year period, Mr. Isaacson independently brought this unlawful activity to the attention of Jimmy Voung (AFN's Branch Compliance Supervisor), Twyla Hankins (AFN's Executive Vice President of Operations), Brandon Johnson (AFN's previous Branch Relations Manager) and various other AFN Branch Relations employees all to no avail.  In response, he was told that this is how AFN conducted business and that he should look the other way since the program was approved by AFN upper management because it was so profitable. As a result of this unlawful business practice, AFN saved millions of dollars, while at the same time unlawfully earned millions of dollars from this activity by selling fraudulent and mispresented residential home loans nationwide.

100.   In or about July 2019, AFN was so backed-up in its fraudulent business practices that Kristin Gibson (AFN's Senior Loan Processor) contacted an employee at Chou Team Realty, LLC ("Monster Loans") by the name of Cynthia Sanchez (Monster Loans Senior Loan Processor) to assist in AFN's unlawful business activity.  Ms. Gibson instructed Ms. Sanchez to manipulate and/or alter AFN's Closing Disclosure documents, which allowed the subject loan to fund with less cost to AFN.  This alternative fraudulent business activity, however, was caught by Brad Brigliani (Monster Loan's General Counsel), who brought this illegal business activity to the attention of Ritesh Singhania (AFN's fraudulently named Chief Operating Officer) (*see below section regarding AFN defrauding the*

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 54

*United States Department of Homeland Security*) <u>and</u> Susie Sensenbach (AFN's Director of Human Resources).  The parties agreed to turn a blind eye on the illegal business activity that both companies were participating in by agreeing to **not hire each** other's respective employees.  Meanwhile, AFN continued unlawfully manipulating residential home loan applications and supporting documents, thus, illegally profiting millions of dollars per years.  AFN executives were so brazen in their illegal activity that AFN's internal Branch Relations Department (operated by Jimmy Vuong and Raul Esperaza) manipulated documents in AFN's internal Loan Origination System (Encompass Date Tracking) to give the impression that its residential home loans were in compliance with Federal and State laws, including lending rules and regulations.

101.   *As stated above, Mr. Isaacson is in possession of four thousand five hundred sixty-nine (4,569) scans and facsimiles from AFN's Brea headquarter (specifically, from the Branch Relations Department, which is situated next to Jonathan Gwin (AFN's Chief Operating Officer) office).  This includes numerous PDF's of AFN's fraudulently created, manipulated and/or altered consumer Closing Disclosures on certain AFN funded loans that were insured by the FHA and/or were unknowingly purchased by institutional investors PennyMac Corporation, Wells Fargo, N.A., Flagstar Bank, Plaza Home Mortgage, Inc., The Money Source, CMG Financial, Impac, Citibank, N.A., Ditech Financial, LLC,*

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 55

1  *Newrez, Inc., Calber Home Loans, Inc., JP Morgan Chase, Freedom Mortgage,*

2  *Home Pointe Financial, Mr. Cooper, First Guaranty Mortgage Corporation,*

3  *AmeriHome Mortgage Company, LLC, Texas Capital Bank, PHH Mortgage*

4
5  *Corporation, BB&T Bank, Northpointe Bank, Fannie Mae ("FNMA")* <u>and</u> *Ginnie*

6  *Mae ("GNMA").*

7  ///

8  ///

9  ///

10 ///

11 ///

12 ///

13 ///

14 ///

15 ///

16 ///

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 56

II.   **AFN'S REFERRAL DESK PROGRAM INTENTIONALLY VIOLATED STATE AND FEDERAL LAWS BY DEFRAUDING THE FEDERAL GOVERNMENT**

102.   AFN's Referral Desk Program operated out of AFN's Brea corporate headquarters, as well as, from AFN's Laguna Hills corporate office.  The program was created by Jack Sherman (AFN's Founder and Chief Executive Officer), John Sherman (AFN's President), Jonathan Gwin (AFN's Chief Operating Officer) and Michael VaVerka (AFN's Referral Desk President, Referral Desk Loan Officer, Division President and Division Manager).  The Referral Desk Program illegally operated in a variety of ways that enabled AFN to unlawfully enrich itself, including specifically to its upper management executives.

A.   **AFN Unlawfully Allowed Unlicensed Employees, Including Full-Time Direct Endorsement Underwriters, to Originate Residential Home Loans and Be Directly Compensated.**

103.   Since at least from December 2015, AFN's Referral Desk Program unlawfully enriched AFN executives and certain AFN managers, including Mr. VaVerka and Jonathan Carrico (AFN's Referral Desk Loan Officer/Manager) by allowing unlicensed AFN employees (*i.e. Scott Keller, Dexter Cajigal, Kenneth Barnes, Kevin Iribarren, John Jackson, Zachary Hamman, Michele Schulman, Crystal Dunn, Michael Jacobs and the list goes on*), including receptionists and

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 57

low-level support staff, to originate and fund residential home loans nationwide
without valid credentials and training as required state and federal laws.

104.   More <u>shocking</u>, AFN allowed its very own underwriting
management team, including full-time Direct Endorsement Underwriters to
violate state and federal laws by directly negotiating the terms and conditions of
residential home loans, knowingly illegally acting as a Licensed Mortgage Loan
Originator (MLO), and directly get paid a commission without any license.
AFN's underwriting practices and quality controls were affected as a result of
letting its full-time Direct Endorsement Underwriters to simultaneously illegally
operate a salesman.

105.   For example, Jack Sherman (AFN's Founder and Chief Executive
Officer) personally approved Rick Asrani (AFN's Director of Underwriting) <u>and</u>
Marat Turbin (AFN's Underwriter Manager) (*both full-time AFN corporate*
*underwriters whose offices were literally several feet away from Mr. Sherman*
*and Mr. Gwin*) to illegally operate, negotiate and fund  residential home loans
directly with AFN consumers.  Mr. Astrani and Mr. Turbin literally operated
AFN's FHA's underwriting program on a full-time basis and at the same time,
illegally selling residential home loans to AFN customers nationwide.  To
achieve this illegality, they enlisted Cheryl Agonowski (AFN's Lead
Underwriter) and Paul Tallman (former AFN Underwriter) to privately

underwrite their very own residential home loans deals to avoid having other AFN underwriters know this illegal activity for profit was occurring.  Mr. Sherman was fully aware of this criminal activity and personally approved it. Acting as an unlicensed Loan Officer and Branch Manager, as well as, a Director of AFN's Underwriting Department is a conflict of interest and a clear violation of a variety of state and federal laws.  This unlawful business activity resulted in an additional financial systemic risk to financial systems worldwide because these very same loans were sold into the United States marketplace and beyond.

106.   Moreover, Mr. Sherman personally allowed Mr. Astrani and Mr. Turbin the ability to be privately paid directly on the profit and loss of AFN.  He further allowed these gentlemen to have their own unique profit and loss name, *to wit,* "AB P&L" within the AFN internal system.  This was done by Mr. Sherman and Mr. Gwin so that other AFN employees, including most importantly, State and/or Federal law enforcement, to conceal AFN's unlawful business activity that was being conspired by these individuals.  From time-to-time during his employment tenure Mr. Isaacson questioned various AFN executives about this unlawful and unethical business activity, however, but nobody was interested in addressing it.

107.   *Mr. Isaacson is in possession of documents confirming all of the above-referenced alleged unlawful behavior, including text messages and emails*

*confirming the above. He is also in possession AFN's Referral Desk "How To" Training Manual that came from Jimmy Vuong (AFN's Referral Desk Compliance Manager) that has detailed step-by-step instructions of AFN's unlawful business practices in this regard.*

**B.    AFN's Referral Desk Training Program unlawfully originated residential home loans by allowing unlicensed AFN employees to communicate terms and conditions and negotiate residential home loans throughout the United States without a valid Branch License and a valid Mortgage Loan Originator (MLO) License.**

108.    Since at least December 2015, AFN has illegally originated, processed and funded residential home loans by using <u>unlicensed</u> employees to unlawfully communicate directly to consumers and negotiate the terms and conditions of residential home loan applications, all against the SAFE Mortgage Licensing Act of 2009, the California Finance Lenders Law (CFLL) and the California Residential Mortgage Lending Act (RMLA).

109.    AFN was so brazen in this unlawful activity, that it created a detailed internal confidential eight (8) page step-by-step training manual (the "Referral Desk - How To Manual") for AFN employees to illegally facilitate the origination, processing and funding of residential home loans nationwide. In or about June 2017, Jimmy Vuong (AFN's Compliance Supervisor) provided Mr. Isaacson with a copy of AFN's Referral Desk - How To Manual.

110.   AFN's Referral Desk - How To Manual unlawfully states that every AFN customer will receive a one-half percent higher interest rate on their respective residential home loan for the remaining terms.  This unlawful action affects communities, families and causes systemic risk and harm to global financial systems.  It also exposes HUD and the FHA to millions of dollars on actual and potential claims on AFN's origination loans.

111.   Furthermore, AFN intentionally misrepresented and omitted material information during the origination and/or underwriting process, and thereafter sold these same fraudulent residential home loans to institutional investors such as PennyMac Corporation, Wells Fargo, N.A., Flagstar Bank, Plaza Home Mortgage, Inc., The Money Source, CMG Financial, Impac, Citibank, N.A., Ditech Financial, LLC, Newrez, Inc., Calber Home Loans, Inc., JP Morgan Chase, Freedom Mortgage, Home Pointe Financial, Mr. Cooper, First Guaranty Mortgage Corporation, AmeriHome Mortgage Company, LLC, Texas Capital Bank, PHH Mortgage Corporation, BB&T Bank, Northpointe Bank, Fannie Mae (FNMA) and Ginnie Mae (GNMA), all for an ill-gotten financial gain.

112.   During his employment tenure at AFN, Mr. Isaacson voiced his deep concern on numerous occasions to various AFN executives, including but not limited to John Sherman (AFN's President), Jonathan Gwin (AFN's Chief Operating Officer), Twyla Hankins (AFN's Executive Vice President of

Operations), David Ross (AFN's Reverse Mortgage Branch Manager), Raul

Esperaza (AFN's Branch Relations Managers) and Brandon Johnson (AFN's

Branch Relations Coordinator).

113.   *Mr. Isaacson is in possession of vast amounts of documents*

*confirming all of this alleged unlawful behavior, including text messages and*

*emails confirming the above.  Most damning, he is also in possession of AFN's*

*Referral Desk "How To" Training Manual that came from Jimmy Vuong (AFN's*

*Referral Desk Compliance Manager) that has detailed step-by-step instructions of*

*AFN's unlawful business practices in this regard.*

### C.   <u>AFN Referral Desk Program compensated unlicensed AFN employees and incentives its unlicensed employees to originate residential home loans</u>.

114.   In or about July 2017 and continuing through Mr. Isaacson's wrongful

termination, AFN unlawfully paid commissions to Michael VaVerka (AFN's

Referral Desk President, Referral Desk Loan Officer, Division President and

Division Manager) <u>and</u> Jonathan Carrico (AFN's Referral Desk Loan

Officer/Manager) to use their Mortgage Origination License ("MLO") to illegally

complete and/or fund residential home loans.  This was purposely done because

certain AFN Branches did not have valid MLO and Branch Mortgage Loan

Origination Licenses.  When an AFN Branch received a residential home loan

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 62

application in a state upon which the subject AFN Branch office was not licensed, AFN corporate derived an unlawful business scheme to fraudulently list a valid residential Mortgage Loan Originator License on Fannie Mae's *Uniform Residential Loan Application Form 1004*, which is a clear violation of state and federal laws, including various lending laws.

115.   Moreover, AFN had already prechosen internal "fall guys", *to wit,* Michael VaVerka (AFN's Referral Desk President, Referral Desk Loan Officer, Division President and Division Manager) and/or Jonathan Carrico (AFN's Referral Desk Loan Officer/Manager), in the event AFN's above-referenced criminal activity was discovered by the Consumer Financial Protection Bureau ("CFPB"), the Federal Bureau of Investigation ("FBI"), institutional investors, such as PennyMac Corporation, Wells Fargo, N.A., Flagstar Bank, Plaza Home Mortgage, Inc., The Money Source, CMG Financial, Impac, Citibank, N.A., Ditech, Newrez, Inc., Calber Home Loans, Inc., JP Morgan Chase, Freedom Mortgage, Home Pointe Financial, Mr. Cooper, First Guaranty Mortgage Corporation, AmeriHome Mortgage Company, LLC, Texas Capital Bank, PHH Mortgage Corporation, BB&T Bank, Northpointe Bank, Fannie Mae (FNMA), Ginnie Mae (GNMA), and customers nationwide.

116.   From time to time during his employment tenure at AFN, Mr. Isaacson conferred with the following AFN executives about whether this conduct

was lawful: John Sherman (AFN's President), Jonathan Gwin (AFN's Chief Operating Officer), Ryan Pinkney (AFN's prior Staff Attorney) and Andy Kay (AFN's General Counsel), Michael VaVerka (AFN's Referral Desk President, Referral Desk Loan Officer, Division President and Division Manager), Twyla Hankins (AFN's Executive Vice President of Operations), Rick Asrani (AFN's Director of Underwriting), Jonathan Carrico (AFN's Referral Desk Loan Officer/Manager).  Nobody took responsibility or wanted to openly discuss this unlawful business activity.  In fact, Mr. Gwin instructed Mr. Isaacson to never discuss this matter on email or text and only in his office located at Brea's corporate headquarters.

117.   Mr. and Mrs. Tarin (AFN Loan No. ) were one of thousands of AFN's customers that were victimized by AFN's unlicensed and unlawful business activity.  They received a higher interest rate in cost and higher loan costs because of AFN's unlicensed activity (See AFN's Referral Desk "How To" Training Manual that states each customer will receive a one half percent higher rate and/or cost.  To add to this illegal activity, AFN mispresented its loan characteristics to the FHA, AFN failed to adequately underwrite this FHA loan, all of which has caused Mr. and Mrs. Tarin to be currently in default as of April 7, 2021.

118.   *Mr. Isaacson has in his possession emails negotiating the compensation of illegally originated residential home loans that were exchanged with him during his AFN employment by Mr. VaVerka and Mr. Gwin.*

119.   *Mr. Isaacson is also in possession of documents confirming all of this alleged unlawful behavior, including text messages and emails confirming the above.  He is also in possession AFN's Referral Desk "How To" Training Manual that came from Jimmy Vuong (AFN's Referral Desk Compliance Manager) that has detailed step-by-step instructions of AFN's unlawful business practices in this regard.*

## III. <u>AFN MISREPRESENTED ITS LOAN ORIGINATION SERVICES TO UNITED STATES VETERANS BY KNOWINGLY DECEIVING AND PROMOTING LOAN CHARACTERISTICS THAT COULD NOT BE SATISFIED AND WERE UNLAWFUL</u>

120.   The Economic Growth, Regulatory Relief, and Consumer Protection Act came into effect on May 22, 2018.  It includes The Protecting Veterans From Predatory Lending Act of 2018 (the Act), a measure designed to protect Veterans from predatory lending practices known as "loan churning" or "serial refinancing", when obtaining a VA-guaranteed refinance loan.   These practices and other similar illegal practices not only impact Veterans negatively, but also disrupt the secondary mortgage market, resulting in higher interest rates to Veterans and lower returns to investors in the secondary market.

121.   As of May 22, 2018, all VA-guaranteed loans must have met the requirements of this new law.   Loan applications taken on or after May 25, 2018, that did not meet the following requirements, were not eligible for guaranty by VA.

122.   AFN business consisted of soliciting United States Veterans to apply for a VA residential home loan with loan-to-value ratios between 90% to 100% of the veterans home value.  This, in spite of the fact that The Economic Growth, Regulatory Relief, and Consumer Protection Act forbid such illegal business activity.

123.   On or about August, 2019, Mr. Isaacson met with John Sherman (AFN's President) and Michael Lensky (AFN's Branch Manager) in Mr. Sherman's office to review options to increase FHA and VA residential home loan applications due to how institutional investor's highly compensated AFN for these VA residential home loans.

124.   During this meeting, Mr. Sherman instructed Mr. Isaacson to purchase personal and credit data consumer information of United States veterans, including active service members, and to specifically target these homeowners for a VA cash-out refinance that had a loan-to-value ratio between 90% to 100%.  This illegal practice was done in spite of Edward Fink's (AFN's Director of Compliance) warnings in multiple emails over a year and one-half time period, some of which Mr. Isaacson was copied on, that this business practice was

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 66

unlawful.  Mr. Sherman did not care.  He informed Mr. Isaacson "*..that AFN had a special institutional investor that no other non-bank lenders had access, …*" and that AFN "*…would greatly profit from this business activity…*" because FHA and VA residential home loans awarded AFN with double compensation.

125.   Adam Holly, from Maryville, California, is just one of hundreds, if not thousands of United States Veterans that were harmed by AFN's unlawful business practices.  He is a veteran of the United States Army who was honorably discharged.  Mr. Holly, like hundreds of other veterans of the United States armed forces, was unknowingly defrauded by AFN.  This was done by AFN unlawfully soliciting VA Veterans for cash-out refinances between a 90% to 100% home-to-loan value in direct conflict with the above-referenced laws.  Hundreds of United States Veterans, including active service members believed that that they were able to receive cash out between the 90% to 100% home-to-loan value, when in fact it was never an option.  These same Veterans, including Mr. Holly, paid for appraisal deposits and termite inspection reports out of their own pocket, believing AFN's representations that they were eligible for a VA cash out loan between 90% to 100% home-to-loan value.

126.   Mr. Isaacson complained about this unlawful activity that was specifically target United States Veterans and active service members in a variety of emails, including text messages and face-to-face meetings with various AFN

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 67

executives, including Twyla Hankins (AFN's Executive Vice President of Operations).  After many months of Mr. Isaacson seeing United States Veterans and active service members economically harmed by AFN's unlawful, unethical and deceptive business practices that it knew were clear violations of federal and states laws, AFN told Mr. Isaacson that they no longer were going to target United States Veterans and active service members.  This, after the fact that AFN caused hundreds of thousands of dollars to be needlessly spent by United States Veterans and active service members in unneeded home appraisals, termite inspection reports, credit reports and various other expenses that AFN demanded the subject United States Veterans and active service members to pay for.

127.   *Mr. Isaacson is in possession of four thousand five hundred sixty-nine (4,569) scans and facsimiles to AFN's Brea headquarter (the Branch Relations Department, which is situated next to Jonathan Gwin (AFN's Chief Operating Officer) office.  These consist of PDF's of AFN's fraudulently created, manipulated and/or altered consumer Closing Disclosures on certain AFN funded loans that were insured by the FHA and/or were unknowingly purchased by institutional investors PennyMac Corporation, Wells Fargo, N.A., Flagstar Bank, Plaza Home Mortgage, Inc., The Money Source, CMG Financial, Impac, Citibank, N.A., Ditech Financial, LLC, Newrez, Inc., Calber Home Loans, Inc., JP Morgan Chase, Freedom Mortgage, Home Pointe Financial, Mr. Cooper, First*

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 68

*Guaranty Mortgage Corporation, AmeriHome Mortgage Company, LLC, Texas*

*Capital Bank, PHH Mortgage Corporation, BB&T Bank, Northpointe Bank,*

*Fannie Mae ("FNMA") and Ginnie Mae ("GNMA").*

### IV. AFN FAILED TO REPORT OR DISCLOSE A LARGE DATA CREDIT DATA THEFT OF ITS CURRENT AND PAST CONSUMERS, INCLUDING THEIR CREDIT REPORT DATA AND PERSONAL INFORMATION

128.   In 2003, the United States Congress enacted The Fair and Accurate Credit Transactions Act (FACTA).  Its stated purpose was to enhance consumer protections, particularly in relation to identity theft.  The law provides for alerts to protect consumers' credit records, including disclosing data breaches involving personal information.  In addition, the FTC's Safeguards Rule, enacted under the Gramm-Leach-Bliley Act, requires financial institutions, including lenders like AFN, to implement reasonable policies and procedures to ensure the security and confidentiality of sensitive customer information.

129.   In or about June 2018, Mr. Isaacson discovered that AFN was violating the FTC's Safeguards and Privacy Rules, as well as Section 5 of the Federal Trade Commission Act. AFN routinely obtains credit reports from consumer reporting agencies that contain sensitive personal information about customers and potential customers. AFN violated the Safeguards Rule because it:

- allowed a home seller to use its account for accessing credit reports in order to refer purchasers for financing without taking reasonable steps to verify the seller's procedures to handle, store, or dispose of sensitive personal information;

- failed to assess the risks of allowing a third party to access credit reports through its account; and

- failed to conduct reasonable reviews of credit report requests made on its account by using readily available information (such as management reports and invoices) to detect signs of unauthorized activity.

130.   AFN allowed certain unlicensed employees (i.e., *Michael Jacobs, Lisa Ballard, Sara Tell, Scott Keller and Zachary Hamman and hundreds more*) to illegally access AFN's own Loan Origination System (Encompass) to "hunt for new business," which is a violation of state and federal laws.  Moreover, in spite of the legal requirement for credit consent from the consumer prior to pulling credit, AFN regularly went beyond the required laws by unlawfully accessing and acquiring personal and credit information of various AFN consumers nationwide. This unlawful business practice was brought to John Sherman (AFN's President) and Jonathan Gwin (AFN's Chief Operating Officer) on numerous occasions during Mr. Isaacson's employment, all to no avail.

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANACIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 70

131.   In spite of AFN actually catching the employee who confessed to stealing AFN's consumers credit data, *to wit,* Michael Jacobs, that Mr. Jacobs was making so much money for AFN that they turned a blind eye.  They forced Mr. Isaacson to fire Mr. Jacobs, but then rehired him and placed him in an AFN branch office that nobody would know about.  Mr. Isaacson found out about this unlawful rehire after reading an AFN newsletter proclaiming individuals that it recently hired.  The same exact thing happened to Scott Keller, who also confessed to the large Data breach.  AFN reportedly fired him and claimed to have filed a lawsuit against Mr. Keller, however, this was just another sham business maneuver since AFN immediately rehired Mr. Keller, thus turning its back on its lawful responsibility. This was done simply because AFN was making so much money off this individual, and other AFN employees who played this same role during Mr. Isaacson's employment tenure.

132.   This is one of many larger data thefts that occurred at AFN that Mr. Isaacson witnessed first-hand and brought to the attention to AFN executive with documentary evidence.  In an email dated in or about June 2019, Mr. Isaacson informed John Sherman (AFN's President) and Jonathan Gwin (AFN's Chief Operating Officer) of a screenshot showing the IP addresses of the computers used to unlawfully access AFN's internal computer system.  It also showed the Velocity validation that the data breach occurred, by whom and by which user-names and in

INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 71

great detail which personal credit information was accessed by unauthorized AFN employees, all for financial gain.  This email further discusses the size of the problem and the amount of personal credit records that were compromised, that being, 1.2 million individual homeowners nationwide.  In response, AFN refused to want to pay any money resulting from any data theft and simply wanted Mr. Isaacson to stop talking about it.  John Sherman (AFN's President) informed Mr. Isaacson that he would going to look into the matter, however, this illegal conduct continued for well over a year during Mr. Isaacson's employment and was the basis of AFN's retaliating against Mr. Isaacson by wrongfully terminating him as discussed hereinbelow.

133. *Mr. Isaacson is in possession of the written report authored by Velocify, an Ellie Mae company, which confirmed that the above-referenced data theft did in fact occur.  He is also in possession of emails from John Sherman (AFN's President) and Jonathan Gwin (AFN's Chief Operating Officer) about the various data thefts and confessions from various past and current AFN employees about stealing of confidential personal data from AFN customers.*

///

///

///

///

INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 72

## V. **AFN UNLAWFULLY SHARED CONFIDENTIAL CONSUMER DATA TO ITS BRANCH OFFICE FOR PROFIT, CAUSING HARM TO ITS CUSTOMERS AND IN VIOLATION OF STATE AND FEDERAL LAW**

134. AFN allowed unlicensed employees (i.e., *Michael Jacobs, Lisa Ballard, Sara Tell, Scott Keller and Zachary Hamman and literally, hundreds more AFN employees*) to unlawfully gain access and review consumer credit reports. In addition, they allowed these very same unlicensed AFN employees to access consumer credit files without proper legal disclosures to AFN's customers and without any prior consent. In most cases, these unlicensed AFN employees never spoke to the customer and issued a Denial or a Customer Withdrawal. They also allowed these same unlicensed employees to provide credit decisions to the very same fraudulently accessed customer files without valid underwriting credentials or training. In fact, AFN charged the costs of its unlawful business practices to selected AFN Branch Office as a cost. Once these unlicensed employees gained commitment from the AFN customer, AFN would then fund the residential home loan without getting proper licensing by further illegally issuing it to its internal Referral Desk Department.

135. Starting in or about April 2018, Mr. Isaacson discovered the first data breach at AFN. He brought this to the attention of John Sherman (AFN's President), Jonathan Gwin (AFN's Chief Operating Officer) and Twyla Hankins

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 73

(AFN's Executive Vice President of Operations) on numerous occasions in person at the Brea headquarters, however, he was told by Ms. Hankins that [sic] "*This is how John wants it*." He also had numerous conversations with Andrew Socratis Kalyviaris (AFN's General Counsel) about this unlawful activity. In response, he told Mr. Isaacson on several occasions that his Branch Office could also conduct itself in this illegal manner to save a lot of money in licensing fees, including the time it took to procure a valid branch and mortgage loan originator license to be legally compliant.

136. *Mr. Isaacson is in possession of every single AFN prospect loan number, cancelled/denied and closed residential home loans, which confirm the above unlawful business activity in great detail.*

## VII. THIRTY PERCENT (30%) OF AFN'S UNLAWFUL BUSINESS REVENUE DERIVES FROM FOUR INTERNAL DIVISIONS THAT WERE FORMED BY JOHN SHERMAN

137. Thirty Percent (30%) of AFN's unlawful business revenue derives from four internal divisions, all of which were formed by John Sherman (AFN's President). Those four internal divisions are operated by Sam Rumi (AFN Regional Branch Manager), Michael Matalka (AFN Regional Branch Manager), John D'Onofrio (AFN's Head of Retail Branching) and Saaed Atef (AFN's Division President).

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 74

138.   These four AFN internal divisions compelled AFN current employees that had valid Mortgage Loan Origination (MLO) licenses to purposely not renew them and instead, illegally instruct these very same and now unlicensed AFN MLO employees to continue to operate as though they were licensed.  This was achieved by AFN listing the subject AFN MLO employee as "the file starter", a term that AFN created to illegally mask the true identity of the true residential mortgage loan originator.

139.   Since at least in or about July 2017, these illegal business practices were specifically performed at the above-referenced AFN locations operated by Mr. Rumi, Mr. Matalka, Mr. D'Onofrio and Mr. Atef.

140.   In each of these AFN locations, unlicensed AFN employees are forced to place the misrepresented and wrongly disclosed residential home loan applications with a validly licensed AFN employee to avoid detection from state and federal authorities, including HUD and private institutional investors such as PennyMac Corporation, Wells Fargo, N.A., Flagstar Bank, Plaza Home Mortgage, Inc., The Money Source, CMG Financial, Impac, Citibank, N.A., Ditech Financial, LLC, Newrez, Inc., Calber Home Loans, Inc., JP Morgan Chase, Freedom Mortgage, Home Pointe Financial, Mr. Cooper, First Guaranty Mortgage Corporation, AmeriHome Mortgage Company, LLC, Texas Capital Bank, PHH

Mortgage Corporation, BB&T Bank, Northpointe Bank, Fannie Mae (FNMA) and Ginnie Mae (GNMA).

141.   Most important, this unlawful business activity affect FHA's insurance fund negatively by resulting in claims to its FHA insurance resulting from AFN's unlawful business practices.

142.   This was done by AFN to  reduce licensing and operational costs, and to reduce the amount of money paid to its employees for those same activities, in additional to increasing the amount of residential home loans that AFN was able to close, all by circumventing state and federal laws prohibiting this unlawful business practice.

143.   *Mr. Isaacson is in possession of AFN fraudulent funded reports, production reports, operations reports, marketing reports, marketing material and emails confirming AFN's defective and illegal marketing material that were addressed to John Sherman (AFN's  President), Jonathan Gwin (AFN's Chief Operating Officer), Ryan Pinkney (AFN's prior Staff Attorney) and Andrew Socratis Kalyviaris (AFN's General Counsel).*

///

///

///

///

## VIII. AFN UNLAWFULLY TERMINATED ITS FORMER DIRECT ENDORSEMENT UNDERWRITER, *TO WIT*, IKAKYI GONZALEZ, FOR HIS REFUSAL TO SIGN KNOWINGLY FRAUDULENT DOCUMENTS ON BEHALF OF AFN TO BE SUBMITTED TO HUD AND THE UNITED STATES DEPARTMENT OF VETERANS AFFAIRS UNDER PENALTY OF PERJURY, AND THEN THEREAFTER PLANNED A COVER UP OF HIS WRONGFUL TERMINATION

144.     In or about September, 2018, Rick Asrani (AFN's Director of Underwriting) and Twyla Hankins (AFN's Executive Vice President of Operations) colluded to come up with a spurious plan to terminate Ikakyi Gonzalez (AFN's Direct Endorsement Underwriter) from AFN for his refusal to sign a United States Veterans Affair Form 26-0785 Lenders Staff Appraisal Reviewer (SAR) Application ("SAR Application") on behalf of AFN to the United States Department of Veterans Affairs ("VA").  Specifically, the subject SAR Application contained false information regarding his underwriting experience, which Mr. Gonzales did not have.  Mr. Asrani and Ms. Hankins, knowing that Mr. Gonzales upon hiring did not have the required two years of VA underwriting experience, still demanded that he execute a SAR Application with false information.  Mr. Gonzales, on multiple occasions, informed Mr. Asrani and Ms. Hankins that he would not sign the SAR Application under penalty of perjury since he and AFN clearly knew he did not have the required underwriting experience. This, in spite of the fact that these same AFN executives promised to give a title

promotion and monetary bonus to Mr. Gonzales if he executed the subject SAR Application on behalf of AFN.

145.   For his refusal to sign a knowingly fraudulent document to the VA, Mr. Astrani, Ms. Hankins and Jonathan Gwin (AFN's Chief Operating Officer) decided to terminate Mr. Gonzales, cover up the wrongful termination and thereafter casted Mr. Gonzales in false light by manipulating loan data and employee performance data to support AFN's unlawful termination.  Mr. Astrani even informed Mr. Isaacson that he personally created an underwriting spreadsheet to substantiate why they terminated Mr. Gonzales in the event AFN was subject to any claim of wrongful termination.  Even more shameful was that Mr. Gwin stated to Mr. Astrani and Mr. Isaacson in a meeting at AFN's Brea headquarter that had Mr. Gonzales signed the subject SAR Application, "…he would had made an easy $10,000.00 more per month."

146.   *Mr. Isaacson has in his possession text messages and emails exemplifying Astrani attempt to extort Mr. Gonzales to execute a fraudulent document to be submitted to the United States Veterans Affairs, which led to AFN's wrongful termination of Mr. Gonzales after he refused to commit this criminal act.*

///

///

///

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 78

**X.    AFN UNLAWFULLY CHARGED AFN BRANCH MANAGERS, INCLUDING MR. ISAACSON, FOR AFN'S EARLY PAYMENT DEFAULTS (EPD) AND EARLY PAYOFF PENALTIES (EPO) CAUSED BY AFN'S INCONSISTENT AND IMPROPER UNDERWRITING PROCESS**

147.    AFN's written policy that is incorporated in its Branch Manager employment agreements unlawfully states that AFN Branch Manager pay [sic] "Actual corporate costs for any early payoffs (EPO), early payment defaults (EPD), buybacks, or any other expenses incurred on loans closed by the Branch."

148.    During Mr. Isaacson's employment at AFN, the company illegally charged its Branch Managers, including Mr. Isaacson, for AFN's Early Payoffs and AFN's Early Payment Default that came as a byproduct of AFN's underling illegal business activities.

149.    Although AFN claims to have a written policy of reviewing 10% of all closed loans and completing an annual audit of its Net Branches, this never occurred.  In fact, AFN unlawfully automatically charged its Branch Managers, including Mr. Isaacson, an Audit Fee per month, which was calculated at $12.50 per funded residential home loan, when in fact AFN never conducted the required audit.  AFN has illegally enriched itself with these unlawful business practices, all of which are in direct violation of HUD guidelines.

150.    Starting in or about November 2017 and continuing to his last day of employment, Mr. Isaacson voiced his concern about this unlawful practice to

COMPLAINT FOR VIOLATION OF THE FINANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 79

Jonathan Gwin (AFN's Chief Operating Officer). He responded by telling Mr. Isaacson that "...*this is the 'big boys league' and if AFN does not make money, then you* [Mr. Isaacson] *do not make any money*." He also instructed Mr. Isaacson to directly contact an AFN customer who recently obtain an AFN residential home loan, to personally pay for the customer's monthly mortgage payment paid. Otherwise, according to Mr. Gwin, Mr. Isaacson "...would have to pay the customers residential monthly mortgage payment." Mr. Isaacson was forced to pay customer mortgage payments resulting from AFN's inconsistent, inadequate and unlawful underwriting practices.

**XI.   AFN INTENTIONALLY ALTERED IT INTERNAL LOAN ORIGINATION SYSTEMS (ENCOMPASS) TO AVOID DISCLOSING THEIR TERMS AND CONDITIONS WITHIN THE THREE (3) DAY TIME PERIOD FOR DISCLOSING AND TO REDUCE SHIPPING COSTS REQUIRED BY LAW WHEN A CONSUMER DOES NOT E-CONSENT**

151.   Pursuant to the Truth in Lending Act and the Real Estate Settlement Procedures Act Integrated Disclosure Rule ("TRID" or "TRID Rule"), a creditor is responsible for ensuring that a Loan Estimate is delivered to its consumer or placed in the mail to the consumer no later than the third (3rd) business day after receipt of the consumer's "application" for all residential mortgage loans that are subject to the TRID Rule. 12 CFR §1026.19(e)(1)(iii). For transactions subject to the TRID

Rule, an "application" consists of the submission of the following six pieces of information:

      1.    The consumer's name;

      2.    The consumer's income;

      3.    The consumer's social security number to obtain a credit report;

      4.    The property address;

      5.    An estimate of the value of the property; and

      6.    The mortgage loan amount sought. *See* 12 CFR §1026.2(a)(3)(ii).

152.   If the consumer submits these six pieces of information, the requirement to provide a Loan Estimate is triggered, and the creditor must ensure that the Loan Estimate is delivered or placed in the mail within three business days. The creditor or, if a mortgage broker receives a consumer's application, either the creditor or the mortgage broker may mail or deliver the Loan Estimate.

153.   AFN violated TRID Rules by knowingly altering its own loan origination system (Encompass).  This was done by Joshua Montano (AFN's Loan Origination System Manager) who at the instruction of Twyla Hankins (AFN's Executive Vice President of Operations) and Jonathan Gwin (AFN's Chief Operating Officer), created a *false field* within AFN's Loan Origination System called "Estimated Value."  This was done to avoid detection by federal, state and institutional investors and from TRID disclosure requirements.

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 81

154.   Although Mr. Isaacson questioned this fraudulent business practice, Ms. Hankins informed him that John Sherman (AFN's President) "…wanted to save shipping costs" and that this way of doing business made it more "…agile." Nothing was ever done to correct this illegal conduct in spite of Mr. Isaacson's continued repeated inquiries.   Instead, Ms. Hankins instructed Mr. Isaacson not to bring this subject matter up to John Sherman (AFN's President) and "…*to not fight this fight*."  In or about August 2018, Ms. Hankins sister, *to wit,* Debra Sweatt and Mr. Isaacson further discussed this unlawful behavior to no avail. Ms. Hankins and Ms. Sweatt actually argued about this unlawful activity in front of Mr. Isaacson. Nothing changed.

155.   As a result of AFN's manipulation of its own Encompass as alleged hereinabove, its caused errors in its disclosure process, including incorrect disclosure loan estimates and defective residential home loan applications and disclosure to its consumers, all of which is a continued violation of TRID Rules. Some AFN employees (i.e., *Clifford Collins*) resigned over this unlawful business practices because they knew what was happening at AFN was unethical and illegal. Moreover, AFN's fraudulent manipulation of its Loan Origination Program (Encompass) caused millions of dollars in other related expenses and harm to consumers nationwide.  It also impacted AFN's Branch Managers compensation

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANACIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 82

plans, including Mr. Isaacson, who lost profit sharing bonuses, efficiency bonuses, commissions and/or commission overrides.

### CAUSES OF ACTIONS

### FIRST CAUSE OF ACTION

**Violations of the False Claims Act**

**(31 U.S.C. § 3729(a)(1)(B))**

**Against All Defendants**

**Use of False Statements – False Loan Certification to HUD**

157.   Mr. Isaacson, on behalf of the United States, incorporates by reference paragraphs 1 through 153 inclusive, as if fully set forth herein.

158.   By virtue of the acts described above, in violation of 31 U.S.C. § 3729(a)(1)(B), for each of the loans originated from AFN's "franchise" or "net branch" operations and submitted to HUD for FHA mortgage insurance, AFN by and through co-defendants JOHN SHERMAN, JACK SHERMAN, JONATHAN GWIN and TWYLA HANKINS, and each of them, knowingly made, used, or caused to be made or used, false records or statements of material to a false and fraudulent claim for payment or approval by the United States.

159.   Mr. Isaacson is aware that over a three-year period material hereto thousands of loans originated by AFN were reported as "seriously delinquent" by HUD which is indicative that actual claims have been or will be incurred.  Mr.

Isaacson is informed and believes that the United States has paid insurance claims, and incurred losses, related to FHA-insurance mortgages in reliance upon the misrepresentations alleged herein that the mortgage was originated in accordance with HUD requirements, including that it was originated by a HUD-approved branch.

160.   Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Defendants, and each of them, are liable to the United States for a civil penalty of not less than $5,500.00 and not more than $22,363.00 for each of the false or fraudulent claims herein as well as actual and treble damages in an amount to be proven at trial. However, on information and belief, the amount of penalties under the False Claims Act is estimated to be between a minimum of twenty million dollars ($20,000,000.00) up to a maximum in excess of three hundred and fifteen million dollars ($315,000,000.00).

161.   In addition on information and belief, actual damages to be treble are estimated to be in excess of sixty million dollars ($60,000,000.00).

///

///

///

///

///

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 84

## SECOND CAUSE OF ACTION

### Violations of the False Claims Act

### (31 U.S.C. § 3729(a)(1)(B))

### Against All Defendants

### Use of False Statements – False Loan Certification to HUD

162.   Mr. Isaacson, on behalf of the United States, incorporates by reference paragraphs 1 through 153 inclusive, as if fully set forth herein.

163.   By virtue of the acts described above, in violation of 31 U.S.C. § 3729(a)(1)(B), Defendants, and each of them caused to be made or used false annual certifications to HUD for each of the branches for which AFN sought approval for the purpose of fraudulently obtaining HUD approval for such branches and the FHA-backed loans they originated.

164.   Mr. Isaacson is aware that over a three-year period material hereto thousands of loans originated by AFN were reported as "seriously delinquent" by HUD which is which is indicative that actual claims have been or will be incurred. The United States paid insurance claims, and incurred losses, relating to FHA-insurance mortgages originated out of CMC's approved branches based on misrepresentations that AFN maintained the branches in compliance with HUD requirements, including certifications that AFN was responsible for the operating costs for the branches.

165.   Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Defendants, and each of them, are liable to the United States for a civil penalty of not less than $5,500.00 and not more than $22,363.00 for each of the false or fraudulent claims herein as well as actual and treble damages in an amount to be proven at trial. However, on information and belief, the amount of penalties under the False Claims Act is estimated to be between a minimum of twenty million dollars ($20,000,000.00) up to a maximum in excess of three hundred and fifteen million dollars ($315,000,000.00).

166.   In addition on information and belief, actual damages to be treble are estimated to be in excess of sixty million dollars ($60,000,000.00).

### THIRD CAUSE OF ACTION

**Violations of the False Claims Act**

**(31 U.S.C. § 3729(a)(1)(A))**

**Against All Defendants**

**Causing False Statements – Reckless Underwriting**

167.   Mr. Isaacson, on behalf of the United States, incorporates by reference paragraphs 1 through 163 inclusive, as if fully set forth herein.

168.   Mr. Isaacson, *ex rel.* United States of America seeks relief against Defendants under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. § 3729(a)(1) (2006), and, as amended, Section 3729(a)(1)(A) of the False Claims

Act, 31 U.S.C. § 3729(a)(1)(A).

169.   As set forth above, Defendants, and each of them, knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented and/or caused to be presented, to an officer or employee of the United States government, false and fraudulent claims for payment or approval in connection with its endorsement of FHA-insurance mortgages, by:

      a.   Submitting false annual certifications and making false representation to HUD with respect to AFN's qualifications for Direct Endorsement Lender status; and/or

      b.   Submitting false loan-level certifications to HUD in endorsing mortgages for FHA insurance.

170.   The United States government paid insurance claims, and incurred losses, relating to FHA-insured mortgages wrongfully endorsed by AFN.

171.   By reason of the false claims Defendants, the United States government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation(s).

///

///

///

///

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 87

## **FOURTH CAUSE OF ACTION**

### **Violations of FIRREA**

### **(12 U.S.C. § 1833a)**

### **Against All Defendants**

### **False Loan Certifications to HUD**

172.   Mr. Isaacson, on behalf of the United States, incorporates by reference paragraphs 1 through 169 inclusive, as if fully set forth herein.

173.   By virtue of the acts described above, and for the purpose of fraudulently obtaining HUD mortgage insurance in violation of 12 U.S.C. § 1833a, for each of the residential loans originated from its shadow branches that is currently in default, but for which no insurance claim has been submitted to HUD, AFN knowingly made, used, or caused to be made or used, false and fraudulent records, statements, or certifications and submitted such false and fraudulent records, statements, and certifications to HUD/FHA in violation of 18 U.S.C. § § 1006 and 1014 (as amended).

174.   Defendants, and each of them, made these statements to HUD/FHA with the intent to defraud or deceive HUD/FHA into providing mortgage insurance (18 U.S.C. § § 1006); and (b) knowingly made false statements for the purpose of influencing the FHA (18 U.S.C. § § 1014, as amended).

175.   Accordingly, for each of the residential loans originated out of its shadow branches that is in default but on which no claim has been made, Defendants are liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

<h1 style="text-align:center">FIFTH CAUSE OF ACTION</h1>

**Violations of FIRREA**

**(12 U.S.C. § 1833a)**

**Against All Defendants**

**False Branch Certifications to HUD**

176.   Mr. Isaacson, on behalf of the United States, incorporates by reference paragraphs 1 through 172 inclusive, as if fully set forth herein.

177.   By virtue of the acts described above, and for the purpose of fraudulently obtaining HUD approval for its branches, AFN knowingly made, used, or caused to be made or used, false and fraudulent records, statements, or certifications and submitted such false and fraudulent records, statements, and certifications to HUD/FHA in violation of 18 U.S.C. § 1006; and (b) knowingly made false statements for the purpose of influencing the FHA (18 U.S.C. § § 1014, as amended).

178.   Accordingly, for each of the false branch certifications it submitted to HUD, Defendants, and each of them, are liable for civil penalties to the maximum

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 89

amount authorized under 12 U.S.C. § 1833a.

## SIXTH CAUSE OF ACTION

### Violations of FIRREA

### (12 U.S.C. § 1833a)

### Against All Defendants

### False Annual Certifications to HUD

179.   Mr. Isaacson, on behalf of the United States, incorporates by reference paragraphs 1 through 175 inclusive, as if fully set forth herein.

180.   By virtue of the acts described above, and for the purpose of fraudulently obtaining HUD approval as an FHA mortgagee and Direct Endorsement Lender, AFN knowingly made, used, false annual certifications stating that AFN had complied with all HUD/FHA requirements, when in fact it had not.  AFN knowingly submitted false statements for the purpose of influencing the FHA (18 U.S.C. § § 1014, as amended).

181.   The false annual certifications submitted on behalf of ANF between 2017 through 2020 deceived HUD into maintaining AFN as a HUD-approved mortgagee and Direct Endorsement Lender, and resulted in HUD paying insurance claims in excess of $100 million on loans originated or sponsored in those years.

182.   Accordingly, for each of the false branch certifications submitted to HUD on behalf of AFN for the years 2017 through 2020, Defendants are liable for

civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## SEVENTH CAUSE OF ACTION

### Violations of FIRREA

### (12 U.S.C. § 1833a)

### Against All Defendants

### False Statement to HUD

183.   Mr. Isaacson, on behalf of the United States, incorporates by reference paragraphs 1 through 179 inclusive, as if fully set forth herein.

184.   By virtue of the acts described above, and for the purpose of fraudulently concealing from HUD AFN's lack of quality control, AFN knowingly made, used, or caused to be made false statement to HUD/FHA and made, used, or caused to be made false and fraudulent records and submitted such false and fraudulent records to HUD/FHA in violation of 18 U.S.C. § § 1006 and 1014).

185.   Defendants, and each of them, (a) made statements to HUD?FHA with the intent to defraud or deceive HUD/FHA concerning AFN's maintenance of a quality control plan (18 U.S.C. § 1006); and (b) knowingly made false statements for the purpose of influencing the FHA (18 U.S.C. § 1004).

186.   Accordingly, for each of the false statements and records submitted or caused to be submitted to HUD, Defendants are liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## EIGHTH CAUSE OF ACTION

### Violations of The False Claims Act

### (12 U.S.C. § 1833a)

### Against All Defendants

### Retaliation in Violation of False Claims Act

187.   As a separate and distinct cause of action, Mr. Isaacson complains and realleges all of the allegations contained in this complaint and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

188.   The False Claims Act protects whistleblowers (employees) from retaliation by their employers.  The anti-retaliation provision of the False Claims Act prohibits an employer from retaliating against an employee "because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations." 31 U.S.C. §3730(h).

189.   Prohibited retaliation includes termination, suspension, demotion, harassment, or any other discrimination in the terms and conditions of employment.

190.   As described hereinabove, Mr. Isaacson actually and reasonably believed that AFN's unlawful actions listed above violated federal statutes, rules and regulations.  Because Mr. Isaacson reasonably believed that AFN was

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 92

committing a fraud on the United States government, and because Mr. Isaacson reasonably believed that such fraud constituted a violation of federal fraud statutes and regulations, including without limitation, the mail fraud, wire fraud, bank fraud and securities fraud statutes, Mr. Isaacson is entitled to bring his claims here.  Mr. Isaacson further believed that his disclosures to AFN's upper management, and the retaliation he experienced because of same, entitle him to bring his claims here.

191.   Mr. Isaacson engaged in various protected employment activities, *to wit*, reporting AFN's unlawful business activity as alleged hereinabove, actions which were in violation of a state or federal statute or a violation of or noncompliance with a local, state, or federal rule or regulation to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance.

192.   Mr. Isaacson engaged in activities protected by 31 U.S.C. §3730(h), by inter alia making formal or informal complaints to one or more supervisors and executives, and/or to a governmental entity, regarding unlawful and/or violation(s) of a state and/or federal statute and/or a violation of or noncompliance with a local, state, or federal rule or regulation, which are "protected activities." As such, any adverse actions taken by an employer against the employee because he made such complaints pursuant to 31 U.S.C. §3730(h), may constitute retaliation against that employee.

193.   AFN's conduct as alleged herein was motivated by its desire to retaliate against him because he reported or disclosed information to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or to a governmental agency, and the employee has reasonable cause to believe that the information discloses a violation of state and/or federal statute(s), or a violation(s) of or noncompliance with a local, state, or federal rule or regulation(s), regardless of whether disclosing the information is part of his job duties.

194.   As detailed hereinabove, Mr. Isaacson repeatedly complained of AFN's unlawful business conduct and inactions all to no avail.  Further, Mr. Isaacson alleges AFN was aware of and failed to remedy AFN's reported unlawful business practice, wherein it retaliated against Mr. Isaacson with continued harassment and further forced Mr. Isaacson to discontinue his employment as a constructive discharge.

195.   As a result of Mr. Isaacson's opposition to AFN's unlawful business practices, Mr. Isaacson suffered contemporaneous, and materially adverse employment effects including constructive discharge. Further, Mr. Isaacson suffered verbal abuse and harassment which would impair the job performance of any reasonable worker in the same or similar circumstances.

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 94

196.   Moreover, Mr. Isaacson was forced to resign wherein he refused to further subject himself to the harassment and abuse of co-defendant John Sherman, in retaliation for his whistleblowing activities of AFN's unlawful business practices.

197.   Further, as a result of Mr. Isaacson's opposition, Mr. Isaacson was denied material employment benefits of wages and other benefits of employment with AFN.

198.   As a direct, foreseeable, and proximate cause of AFN's unlawful retaliation, Mr. Isaacson suffered and continues to suffer losses in earnings and employment benefits, damage to his professional reputations, career opportunities, employment benefits, and other incidental and consequential damages and losses, all in an amount to be proven at trial.

199.   As a further direct, foreseeable, and proximate result of AFN's unlawful conduct, Mr. Isaacson has suffered extreme and severe mental anguish, humiliation, emotional distress, loss of enjoyment of life, nervousness, tension, anxiety and depression, resulting in damages in an amount to be proven at the time of trial.

200.   The acts of AFN were done fraudulently, maliciously and oppressively and with the advance knowledge, conscious disregard, authorization, ratification or act of oppression on the part of AFN's officers, directors, or

managing agents of the corporation. The actions and conduct of AFN were intended to cause injury to Mr. Isaacson and constituted deceit and concealment of material facts known to AFN with the intention on the AFN's part to deprive Mr. Isaacson of property and legal rights, justifying an award of exemplary and punitive damages in an amount according to proof.

201.   Relief under 31 U.S.C. 3730 (h)shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff IAN ISAACSON, *ex rel.* United States of America, prays for monetary judgment and equitable relief against defendant AMERICAN FINANCIAL NETWORK, INC. as follows:

A.   For actual damages in an amount to be proven at trial but which are estimated to be in excess of sixty million dollars ($60,000.00) from defaulted loans from shadow branches that have resulted in claims paid by the United States, and civil penalties for the maximum amount allowed by law.

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 96

B.      For civil penalties in the maximum amount of $22,363.00 for each of Defendants' violations of the False Claims Act to be proven at trial but which are estimated to be in excess of three hundred and fifteen million dollars ($315,000,000.00).

C.      For treble damages in an amount to be proven at trial but which are estimated to exceed one hundred and eighty million dollars ($180,000,000.00) pursuant to the False Claims Act, 31 U.S.C. Section 3729(a), plus civil penalties as are required by law, which currently are on the range between $5,500.00 and $11,500.00 per violation of the False Claims Act, post judgment interest, costs and other such relief as may be necessary and proper, including but not limited to reasonable attorneys' fees and costs.

D.      For all costs and expenses incurred by Mr. Isaacson in this action, pursuant to 31, U.S.C. § 3729(a) with interest as well as the costs and expenses incurred by the United States.

E.      For civil penalties pursuant to FIRREA for each claim up to the maximum amount of one million dollars ($1,000,000.00), or the amount of gain to Defendants, and each of them, or, if greater, the amount of the loss to HUD stemming from such conduct, post judgment interest, costs and other such relief as may be necessary and proper, including but not limited to reasonable attorneys' fees and costs.

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 97

F.     In the event the United States intervenes and proceeds with this action, for an award in favor of Mr. Isaacson for brining this action in the amount of at least fifteen percent (15%) but not more than twenty-five percent (25%) of the proceeds in the action.

G.     In the event the United States does not intervenes or otherwise proceed with this action, for an award in favor of Mr. Isaacson for bringing this action in the amount of at least twenty-five percent (25%) of the proceeds in the action.

H.     For an award of any such further relief as is deemed proper.

JUNE 30, 2021           THE LAW OFFICE OF JEFFREY G. JACOBS

By: _____

       JEFFREY G. JACOBS, ESQ.
       ATTORNEY FOR PLAINTIFF,
       IAN ISAACSON

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 98

## **DEMAND FOR JURY BY JURY**

Plaintiff Ian Isaacson, *ex rel.* United States of America, hereby

demands a trial by jury on all issues triable by jury.

JUNE 30, 2021                    THE LAW OFFICE OF JEFFREY G. JACOBS

By: _____

                    JEFFREY G. JACOBS, ESQ.
                    ATTORNEY FOR PLAINTIFF,
                    IAN ISAACSON

COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT AND FINANANCIAL
INSTITUTIIONS REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 - 99